UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

| | |
|---|---|
| PHILIPS AMADOR, SYLVESTER CETINA, | : |
| JOANN SUNKETT, individually and on behalf | : |
| of others similarly situated, | : No. 11-cv-4326 (RJS)(AJP) |
| | : |
| Plaintiffs, | : |
| | : |
| -against- | : |
| | : |
| MORGAN STANLEY & CO. LLC f/k/a | : |
| MORGAN STANLEY & CO. Incorporated, | : |
| MORGAN STANLEY SMITH BARNEY | : |
| LLC, and MORGAN STANLEY, | : |
| | : |
| Defendants. | : |

-----------------------------------------------------------X

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF CONDITIONAL
CERTIFICATION AND NOTICE PURSUANT TO 29 U.S.C. § 216(b)**

Seth R. Lesser
Fran L. Rudich
Michael J. Palitz
KLAFTER OLSEN & LESSER LLP
Two International Drive, Suite 350
Rye Brook, New York 10573
Telephone:  (914) 934-9200

Gregg I. Shavitz
Susan H. Stern
SHAVITZ LAW GROUP, P.A.
1515 South Federal Highway
Boca Raton, Florida 33432
Telephone:     (561) 447-8888

Attorneys for Plaintiffs and Opt-in Plaintiffs

## <u>TABLE OF CONTENTS</u>

I.   PROCEDURAL HISTORY AND PERTINENT FACTS ......................................... 1

   A.  The Nature of Plaintiffs' Claims .......................................................... 1

   B.  Statement of Facts .............................................................................. 2

II.  ARGUMENT......................................................................................... 12

   A.  The Remedial Purposes of the FLSA Warrant Prompt and Accurate Notice to
       Potential Collective Action Members ................................................. 12

   B.  Plaintiffs Have More Than Satisfied the Lenient Standards for Conditional
       Certification and Notice to the Potential Collective Action Members .............. 14

   C.  The Court Should Order that Notice Be Sent to Potential Collective Action
       Members and Order Defendants to Produce Complete Contact Information for
       CSAs ................................................................................................. 23

   CONCLUSION..................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Adams v. Inter-Con Sec. Sys.*, 242 F.R.D. 530 (N.D. Cal. 2007) ..................................... 19

*Alli v. Boston Market*, 2011 U.S. Dist. LEXIS 101530 (D. Conn. Sept. 8, 2011)............ 18

*Aros v. United Rentals, Inc.*, 269 F.R.D. 176 (D. Conn. 2010) ........................................ 18

*Bowens v. Atl. Maint. Corp.*, 546 F. Supp. 2d 55 (E.D.N.Y. 2008).................................. 15

*Braunstein v. Eastern Photographic Labs., Inc.*, 600 F.2d 335 (2d Cir. 1978)................ 13

*Cabrera v. 211 Garage Corp.*, 2008 U.S. Dist. LEXIS 76050
     (S.D.N.Y. Aug. 22, 2008)........................................................................... 15, 19

*Cohen v. Gershon Lehrman Group*, 686 F. Supp. 2d 317 (S.D.N.Y. 2010)..................... 14

*Craig v. Rite Aid Corp.*, 2009 U.S. Dist. LEXIS 114785 (M.D. Pa. Dec. 9, 2009).......... 18

*Creely v. HCR Manorcare*, 789 F. Supp. 2d 819 (N.D. Ohio 2011) ................................ 18

*Cunningham v. Elec. Data Sys. Corp.*, 754 F. Supp. 2d 638 (S.D.N.Y. 2010) .......... 16, 17

*Damassia v. Duane Reade, Inc.*, 2006 U.S. Dist. LEXIS 73090 (S.D.N.Y. 2006) .... 14, 18

*Doucoure v. Matlyn Food, Inc.*, 554 F. Supp. 2d 369 (E.D.N.Y. 2008)........................... 18

*Fasanelli v. Heartland Brewery, Inc.*, 516 F. Supp. 2d 317 (S.D.N.Y. 2007)............ 14, 17

*Gilbert v. Citigroup, Inc.*, 2009 U.S. Dist. LEXIS 18981
     (N.D. Cal. Feb. 18, 2009) ........................................................................... 21, 23

*Gjurovich v. Emmanuel's Marketplace, Inc.*, 282 F. Supp. 2d 101
     (S.D.N.Y. 2003)........................................................................................... 16, 18

*Gortat v. Capala Brothers, Inc.*, 2010 U.S. Dist. LEXIS 35451
     (E.D.N.Y. Apr. 9, 2010) ............................................................................. 13, 17

*Hanchard-James v. Brookdale Family Care Ctrs.*, 2012 U.S. Dist. LEXIS 113118
     (E.D.N.Y. Aug. 9, 2012)............................................................................. 19, 23

*Harhash v. Infinity West Shoes, Inc.*, 2011 U.S. Dist. LEXIS 96880
     (S.D.N.Y. Aug. 24, 2011).................................................................................. 24

*Hernandez v. Merrill Lynch & Co.*, 2012 U.S. Dist. LEXIS 49822
(S.D.N.Y. Apr. 6, 2012) ........................................................................ *passim*

*Hoffmann v. Sbarro Inc.*, 982 F. Supp. 249 (S.D.N.Y. 1997) .................................... 13, 15

*Hoffmann-LaRoche, Inc. v. Sperling*, 493 U.S. 165 (1989).................................. 13, 14, 23

*Holbrook v. Smith & Hawken, Ltd.*, 246 F.R.D. 103 (D. Conn. 2007)............................ 18

*Ibea v. Rite Aid Corp.*, 2011 U.S. Dist. LEXIS 144652 (S.D.N.Y. Dec. 14, 2011) ......... 14

*In re Penthouse Exec. Club Comp. Litig.*, 2010 U.S. Dist. LEXIS 114743
(S.D.N.Y. Oct. 26, 2010)........................................................................ 15, 17

*Iriarte v. Redwood Deli & Catering, Inc.*, 2008 U.S. Dist. LEXIS 50072
(E.D.N.Y. June 30, 2008) ........................................................................ 18

*Jason v. Falcon Data Com, Inc.*, 2011 U.S. Dist. LEXIS 77352
(E.D.N.Y. July 18, 2011)........................................................................ 17

*Khalil v. Original Homestead Rest.*, 2007 U.S. Dist. LEXIS 70372
(S.D.N.Y. Aug. 9, 2007)........................................................................ 18

*Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 2d 346 (E.D.N.Y. 2008) ...................... 17

*Legrand v. Educ. Mgmt. Corp.*, 2004 U.S. Dist. LEXIS 17696
(S.D.N.Y. Sept. 1, 2004)........................................................................ 19

*Levy v. Verizon Info. Servs.*, 2007 U.S. Dist. LEXIS 43223 (E.D.N.Y. 2007)................ 22

*Malloy v. Richard Fleischman & Assocs. Inc.*, 2009 U.S. Dist. LEXIS 51790
(S.D.N.Y. June 3, 2009) ........................................................................ 15

*Marcus v. Am. Contract Bridge League*, 254 F.R.D. 44 (D. Conn. 2008) ...................... 18

*Moore v. Eagle Sanitation, Inc.*, 2011 U.S. Dist. LEXIS 77126
(E.D.N.Y. July 18, 2011)........................................................................ 24

*Morangelli v. Chemed Corp.*, 275 F.R.D. 99 (E.D.N.Y. 2011)........................................ 16

*Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233 (11th Cir. 2008)........................ 14

*Patton v. Thomson Corp.*, 364 F. Supp. 2d 263 (E.D.N.Y. 2005).................................. 24

*Raniere v. Citigroup, Inc.,* 827 F. Supp. 2d 294 (S.D.N.Y. 2011) ...................... 12, 17, 24

*Ravenell v. Avis Budget Car Rental, LLC*, 2010 U.S. Dist. LEXIS 72563
(E.D.N.Y. July 19, 2010) ............................................................................. 15

*Ruggles v. Wellpoint*, 591 F. Supp. 2d 150 (N.D.N.Y. 2008) ........................................... 20

*Sipas v. Sammy's Fishbox, Inc.*, 2006 U.S. Dist. LEXIS 24318
(S.D.N.Y. Apr. 24, 2006) ............................................................................ 18

*Stevens v. HMSHost Corp.*, 2012 U.S. Dist. LEXIS 146150
(E.D.N.Y. Oct. 10, 2012) ............................................................................ 23

*Vaughn v. Mortgage Source, LLC*, 2010 U.S. Dist. LEXIS 36615
(E.D.N.Y. Apr. 14, 2010) ............................................................................ 24

*Whitehorn v. Wolfgang's Steakhouse, Inc.*, 767 F. Supp. 2d 445(S.D.N.Y. 2011) .......... 24

*Winfield v. Citibank, N.A.*, 843 F. Supp. 2d 397 (S.D.N.Y. 2012) ........................... *passim*

*Young v. Cooper Cameron Corp.*, 229 F.R.D. 50, 56-57 (S.D.N.Y. 2005)…………......24

*Zheng Fang v. Yongjing Zhuang*, 2010 U.S. Dist. LEXIS 133618
(E.D.N.Y. Dec. 11, 2010) ............................................................................ 18

*Zivali v. AT&T Mobility LLC*, 646 F. Supp. 2d 658 (S.D.N.Y. 2009)....................... 19, 23

**Statutes and Rules**

29 U.S.C. § 255(a) ........................................................................................... 13

Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*................................................... *passim*

Fed. R. Civ. P. 23 ........................................................................................... 12

**Other Authorities**

Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure  1807
(3d ed. 2005) ................................................................................................ 13

Plaintiffs Philips Amador, Sylvester Cetina, and JoAnn Sunkett, together with opt-in Plaintiffs Jodi Goldman, Adrienne McGrath, Melynda Monfils, David Pierce, and Marlene Roberts (together "Plaintiffs") move this Court for an Order conditionally certifying this case as a Fair Labor Standards Act ("FLSA") collective action.  The Court should grant the Motion so that additional current and former Client Services Associates ("CSAs") who worked for Defendants Morgan Stanley & Co. LLC, Morgan Stanley Smith Barney, LLC, and Morgan Stanley (collectively "Morgan Stanley") can be notified of their right to participate in this lawsuit.  Such an Order would be in accordance with the overwhelming precedent in this Court granting conditional certification of FLSA collective actions after plaintiffs have made a "modest factual showing" to meet their "minimal burden."  *Myers v. The Hertz Corp.*, 624 F.3d 537, 554-55 (2d Cir. 2010) ("*Hertz*"); *Winfield v. Citibank, N.A.*, 843 F. Supp. 2d 397, 403, 409 (S.D.N.Y. 2012) (Koeltl, *J.*) (granting conditional certification in a substantially similar case against Citibank).

## I.      PROCEDURAL HISTORY AND PERTINENT FACTS

### A.      The Nature of Plaintiffs' Claims

On June 27, 2011, Plaintiff Philips Amador, a former Morgan Stanley CSA, filed his Complaint alleging violations of the FLSA on behalf of himself and all other similarly situated employees.  Dkt. No. 1.  Plaintiff alleged that Morgan Stanley willfully did not pay Plaintiff and other CSAs overtime wages for hours worked "off-the-clock" in excess of 40 in a workweek.  Plaintiff has amended his complaint three times to add additional parties and state law class claims.  On February 2, 2012, Plaintiffs filed their Third Amended complaint.  Dkt. No. 24.  To date, eight CSAs who worked at ten branches in

six states -- New York, New Jersey, Maryland, Florida, Utah and New Mexico -- have joined this lawsuit alleging that Defendants similarly failed to pay them for all overtime hours worked.  After conducting limited discovery directed to conditional certification issues, including, specifically, the depositions of eight Plaintiffs and, as also supported with declarations from three other CSAs who worked at three branches in Michigan, Texas and Virginia, Plaintiffs make this motion for Court-supervised notice to other current and former CSAs to provide them an opportunity to join this lawsuit to seek unpaid overtime wages and other damages.

### B.    Statement of Facts

"Morgan Stanley is a global financial services firm that, through its subsidiaries and affiliates, provides its products and services to a large and diversified group of clients and customers, including corporations, governments, financial institutions and individuals."  Morgan Stanley 10-K, http://www.morganstanley.com/about/ir/shareholder /10k2011/10k2011.html.  Defendants employ CSAs at branch locations throughout the United States.  Morgan Stanley Answer (Dkt. No. 28) at ¶ 3.  CSAs assist Morgan Stanley's Financial Advisors by performing such duties as handling client communications, opening client accounts, scheduling appointments, general clerical duties, basic financial research, and facilitating trades.[1]  Morgan Stanley has produced a uniform job description for the CSA position, which indicates that it believes all CSAs

---

[1] *See* Exh. B (Deposition of Philips Amador); Exh. C (Deposition of Sylvester Cetina); Exh. D (Deposition of JoAnn Sunkett); Exh. E (Deposition of Jodi Goldman); Exh. F (Deposition of Adrienne McGrath); Exh. G (Deposition of Melynda Monfils); Exh. H (Deposition of David Pierce); Exh. I (Deposition of Marlene Roberts); Exh. J (Declaration of Jennie Dunaway); Exh. K (Declaration of Stephanie Forrest); Exh. L (Declaration of Miranda Fulk); to the Declaration of Seth R. Lesser ("Lesser Dec."). Exhibits to this Declaration shall be in the form "Exh."  Transcript exhibits will hereafter be referred to with the name of the deponents in parenthesis following the Exh. reference.

perform similar job duties.  Lesser Dec. (Exh. M) (job description).   Since all CSAs are

classified as non-exempt, there is no dispute that they are entitled to overtime wages for

all hours worked in excess of 40 per week and thus, are similarly situated with respect to

overtime entitlement and for purposes of this Motion.

Despite Morgan Stanley's written policy to pay overtime, the facts adduced to

date demonstrate that Defendants maintained a common, "off-the-clock" overtime policy

and practice for its CSAs, and this evidence more than meets the minimal requirement for

conditional certification.  CSAs from nine states and 13 different offices consistently

testified that they frequently were required to work overtime "off-the-clock" to meet their

job requirements and complete assignments given to them by Morgan Stanley.  *See*

Amador Dep. (Exh. B) at 213:8-11 ("[T]here was a lot of work to be done for them. . . .

[Y]ou couldn't get everything done."); Cetina Dep. (Exh. C) at 68:23-69:2 ("[W]ork had

to get done."); McGrath Dep. (Exh. F) at 116:6-15, 128:7-12 ("I was fully dedicated to

serving the clients . . . that required staying additional time to get done what needed to be

done."); Goldman Dep. (Exh. E) at 156:2-18 ("I had too much to do. . . . [I worked

overtime] to enable getting the work done . . . to meet what it was that [the clients] were

attempting to accomplish.  It wasn't because I wanted to."); Monfils Dep. (Exh. G) at

74:1-8 ("there w[ere] deadlines that had to be met, I had to do what had to be done to [ ]

help my advisors meet those deadlines"); Roberts Dep. (Exh. I) at 171:11-16 ("[I]t's very

difficult to finish my work while being interrupted by seven [supervisors] during the

day."); Sunkett Dep. (Exh. D) at 63:12-16 (Sunkett worked through lunch because,

"[w]ork had to be done; someone ha[d] to answer the phones."); Pierce Dep. (Exh. H) at

58:15-16 (CSAs worked through their lunch or after hours "[b]ecause it was something

that needed to be done."); *see also* Declaration of Jennie Dunaway ("Dunaway Dec.") ¶ 4

("Working overtime hours to accommodate Morgan Stanley's clients and meet Morgan

Stanley's business objectives was a routine and necessary part of the CSA position.");

Declaration of Stephanie Forrest ("Forrest Dec.") ¶ 3 (same); Declaration of Miranda

Fulk ("Fulk Dec.") ¶ 4 (same).

Notwithstanding that the work CSAs completed was for Morgan Stanley's

benefit, CSAs were routinely reprimanded for reporting overtime and/or directly

instructed or intimidated into reporting only forty hours per week regardless of actual

hours worked.  For example, Opt-in Adrienne McGrath, who worked at the Mount

Laurel, New Jersey branch, testified that, after she submitted accurate timesheets with

overtime hours, her Complex Service Manager (a manager who oversees multiple

branches and approves branch timesheets), told her "that the policy is . . . that we put

eight hours for a 40-hour week" regardless of how many hours were actually worked.

McGrath Dep. (Exh. F) at 101-04, 114-15, 117; *see also* Amador Dep. (Exh. B) at 75:11-

17; 253:8-254:5 (supervisors told all CSAs that even if they "worked overtime, . . . [they]

[were] only allowed to [record] from 8:30 to 5:00" with a mandatory half-hour lunch, on

their timesheets); Cetina Dep. (Exh. C) at 186:25-187:5 (Cetina's requests for overtime

"were met with resistance.  When [he] asked for overtime, it would be no, you're not

getting overtime.  You're not putting overtime.  You're just not going to do it.");

Goldman Dep. (Exh. E) at 111:15-17 (supervisors told Goldman that she could not

"submit overtime[.]  Morgan Stanley [was] not going to pay it[.]  [She should] simply

turn in a timesheet showing seven and-a-half hours worked."); Monfils Dep. (Exh. G) at

105:14-23 (Supervisor repeatedly yelled at Monfils over the telephone whenever Monfils

submitted timesheets reflecting overtime); Roberts Dep. (Exh. I) at 93:10-14 ("When you are told that your hours are a certain time . . . you want to comply. . . . I didn't want to jeopardize my job, so I didn't say anything."); Pierce Dep. (Exh. H) at 100:25-101:1 (Management told all CSAs "to do [their] best not to work … overtime because they weren't going to get paid for it."); Forrest Dec. ¶ 5 ("Management, including Branch . . . and Operations Manager[s,] made it clear that recording overtime hours was not permitted."); *see also* Dunaway Dec. ¶ 6 ("typical and weekly overtime hours worked were not to be recorded, per Morgan Stanley policy and practice"); Fulk Dec. ¶ 6 (same).

When CSAs did submit overtime, their supervisors either altered the time records to show only 40 hours worked per week or demanded that CSAs do so.  *See* Amador Dep. (Exh. B) at 183:14-16 (Amador was "asked to change [his] time sheet to reflect the ["]correct time["]"); McGrath Dep. (Exh. F) at 101:9-13 (supervisors told McGrath that she was "incorrectly filling out [her] timesheets [and that she] was only to put eight hours down for a 40-hour week."); Goldman Dep. (Exh. E) at 107:8 (Goldman was told to "revise [her] timesheet to show lesser or no overtime."); Monfils Dep. (Exh. G) at 98:19-99:4 (When Monfils's timesheets were rejected because she had recorded that she worked during her lunch break, "she [was] told [ ] to alter [them], showing that [she] took [her] lunch."); Roberts Dep. (Exh. I) at 159:5-8 (all CSAs were required to underreport the hours they worked); *see also* Dunaway Dec. ¶ 8 (supervisors rejected timesheets reflecting overtime and either changed timesheets themselves or demand they be resubmitted without any overtime work shown); Forrest Dec. ¶ 7 (supervisor rejected timesheets with overtime reported and demanded that overtime be removed from timesheets).

Morgan Stanley only paid overtime when it was specifically pre-approved for special circumstances (*i.e.*, to work on a weekend to set up a new office), resulting in a practice where overtime work was performed but not compensated. *See* Amador Dep. (Exh. B) at 179:25-180:4 (Amador was not paid for his overtime because, in Morgan Stanley's words, "we couldn't pay you. The amount was limited for the budget[ ] . . . We just couldn't do it."); Cetina Dep. (Exh. C) at 162:15-163:11 (although CSAs were told they would not be paid for overtime work unless pre-approved, leaving "at 5:00 wasn't really an option"); Goldman Dep. (Exh. E) at 32:20-21 (supervisor advised Goldman "that it was Morgan Stanley's policy not to pay overtime"); Monfils Dep. (Exh. G) at 96:20-97:1 (timesheets reflecting overtime were rejected because, according to supervisors, "overtime was not allowed unless it was pre-approved"); Roberts Dep. (Exh. I) at 171:11-16 ("overtime, if there was going to be overtime, [] would have to" be pre-approved by the branch manager); Pierce Dep. (Exh. H) at 104:22-105:17 (CSAs would only be compensated for overtime if management asked them to work, for example, through their lunches); *see also* Dunaway Dec. ¶ 6 (although "[o]n some occasions, management would permit [overtime] for special situations, [] typical[ly,] [] weekly overtime hours worked were not to be recorded, per Morgan Stanley policy and practice"); Forrest Dec. ¶ 5 (same); Fulk Dec. ¶ 6 (same). Thus, while some overtime is contained in pay records for CSAs for these special circumstances, CSAs regularly worked overtime "off-the-clock" pursuant to the typical needs of the job and Morgan Stanley's requirements. *See* Amador Dep. (Exh. B) at 213:8-11; Cetina Dep. (Exh. C) at 68:23-69:2; McGrath Dep. (Exh. F) at 116:6-15, 128:7-12; Goldman Dep. (Exh. E) at 156:2-18; Monfils Dep. (Exh. G) at 74:1-8; Roberts Dep. (Exh. I) at 171:11-16; Sunkett

Dep. (Exh. D) at 63:12-16; Pierce Dep. (Exh. H) at 58:15-16; *see also* Dunaway Dec. ¶ 6;

Forrest Dec. ¶ 5; Fulk Dec. ¶ 6.

 Morgan Stanley's documents and timesheets confirm the Plaintiffs' testimony.

These show that, as a corporate policy, recording overtime was strictly limited.  Thus, for

example, e-mails from a Complex Service Manager to multiple branches and CSAs state:

> "Pls keep in mind there is no overtime.  If your time sheet is reflecting overtime something is not right."  Lesser Dec. (Exh. N) at 115199.

> "There is no overtime and schedules can not [sic] be customized."  Lesser Dec. (Exh. N) at 117653.

Multiple documents show that overtime had to be pre-approved.  *See e.g.*, Lesser Dec.

(Exh. N) at 113627, 119428.  The CSAs, in turn, did not report actual hours worked

because they were intimidated by their supervisors and feared discipline for violating

Morgan Stanley's no overtime policy.  *See* Amador Dep. (Exh. B) at 204:14-205:2

(Amador was always told that the policy was to record only eight hours of work per day.

"[E]very branch manager . . . had this policy in place[.]"); Cetina Dep. (Exh. C) at

108:17-18; 186:25-187:4 ("when the managers are telling you that there is no overtime,

then there's no overtime."); Monfils Dep. (Exh. G) at 105:16 (Monfils stopped

submitting timesheets reflecting overtime work because when she did, she would be

yelled at by her supervisor who was a "very intimidating person."); Roberts Dep. (Exh. I)

at  92:22-93:1 ("When you are trying to keep your job and you are told that there's

certain times you should work and you should report, you are going to comply.  If you

don't, you might lose your job and I was afraid to lose my job."); Pierce Dep. (Exh. H) at

106:1-3 ("[I]t was the work that had to be done.  I mean, the point is [sic] that if I would

have not done that work I would have been fired."); *see also* Dunaway Dec. ¶ 12 ("I was

under the belief that I would lose my job if I reported the overtime I worked as it would violate Morgan Stanley's policy which required CSA's to work off-the-clock overtime hours."); Forrest Dec. ¶ 10 (same); Fulk Dec. ¶ 10 (same).

Similarly, when opt-in Melynda Monfils stated that she worked overtime in her pre-audit questionnaire[2] concerning the CSA position, a Branch Manager asked Ms. Monfils to provide details stating that "Firm policy does not permit overtime without Complex Manager approval, and Tom [the Complex Manager] has advised that he has not approved any overtime for anyone."  Lesser Dec. (Exh. N) at 94875.  Ms. Monfils explained that she made that statement in her pre-audit questionnaire because she, in fact, had "worked overtime" and is classified as "non-exempt."  *Id.*  Fearing reprisal and under pressure, Ms. Monfils revised her pre-audit questionnaire to state that she did not work overtime to which the Branch Manager responded "Great, Thanks!"  Importantly, after learning that she worked overtime for which she was not compensated, no one at Morgan Stanley ever asked Ms. Monfils for additional information so that it could properly compensate her for the overtime she had worked.  *Id.*; *see also* Goldman Dep. (Exh. E) at 154:22-23 (supervisors told Goldman that when completing her 2009 Sales Questionnaire, she was to indicate that she did not work overtime); Roberts Dep. (Exh. I) at 137:11-19 (same).

The evidence also shows that Morgan Stanley's supervisors either knew that CSAs were working overtime because they assigned work to them or recklessly turned a blind-eye to the fact that employees were working after hours.  *See* Amador Dep. (Exh. B) at 147:12-148:4 (Amador complained "up the chain of command" and informed his

---

[2] Morgan Stanley asked certain CSAs to complete a pre-audit questionnaire which asked questions relating to job duties, compensation, hours worked, and other matters.

branch manager that he was "asked to work overtime[ ] and to fill in [his] time sheets in an improper manner."); Cetina Dep. (Exh. C) at 165:7-11 ("[I]t was kind of a joke, almost.  Of course you're putting in overtime. . . . It was just kind of the general sentiment in the office."); Goldman Dep. (Exh. E) at 165:15-166:4 (supervisors regularly interacted with Goldman while she was working after hours); Monfils Dep. (Exh. G) at 45:13-16 (Monfils informed her supervisor that she had "worked through lunch hours on specific dates[ ] . . . [and] that they didn't reflect on [her] timesheet[, to which her supervisor replied] . . . 'So'[.]"); Roberts Dep. (Exh. I) at 141:18-21 (even on the occasions supervisors asked Roberts to work late, Roberts would not record her overtime work); Pierce Dep. (Exh. H) at 166:2-4 (supervisors told Pierce that he was "not entitled to [overtime]" and "[t]hat's just the way it is."); *see also* Dunaway Dec. ¶ 10 ("The Branch Manager was aware that I worked in excess of 40 hours per week and that the time I reported did not reflect the hours I actually worked."); Forrest Dec. ¶ 9 (same); Fulk Dec. ¶ 9 (same).

Moreover, Morgan Stanley's supervisors did not take any measures to prevent the overtime work they knew was occurring at their branches.  *See* Amador Dep. (Exh. B) at 73:4-8 (although on numerous occasions the branch manager was notified of Amador's overtime work, Amador was never properly compensated); Cetina Dep. (Exh. C) at 72:5-8 ("[P]retty much every [ ] CSA stay[ed] past 5, [ ] it was just kind of like the thing … that it was okay."); McGrath Dep. (Exh. F) at 141:21-23 (McGrath was never "ask[ed] or encourage[d] [ ] to leave at five"); Monfils Dep. (Exh. G) at 47:10-12 (supervisors "didn't want [Monfils's timesheet] to show that [she had] worked through lunch.  [They] wanted [it] to show as if [she had] left for lunch, which [she had] not."); Roberts Dep.

9

(Exh. I) at 99:4-7 (all CSAs were told that even if they worked overtime, it should not be reflected on their timesheets); Pierce Dep. (Exh. H) at 108:4-6 (supervisors asked CSAs to work through their lunch when call volumes were high); *see also* Dunaway Dec. ¶ 10 (supervisor knew of "off-the-clock" overtime work); Forrest Dec. ¶ 9 (same); Fulk Dec. ¶ 9 (same). Nor did Morgan Stanley have a policy for supervisors to ensure that all CSA work stopped before exceeding forty hours. To the contrary, as noted, supervisors told CSAs only to report forty hours worked because Defendants would not pay overtime. Indeed, the policy to keep overtime costs to a minimum was so intense that, in at least some instances, Morgan Stanley managers took the drastic action of altering their CSAs' time entries or flat out rejecting timesheets with overtime hours reported.[3] *See* Amador Dep. (Exh. B) at 183:14-16; McGrath Dep. (Exh. F) at 101:9-13; Goldman Dep. (Exh. E) at 107:8; Monfils Dep. (Exh. G) at 98:19-99:4; Roberts Dep. (Exh. I) at 159:5-8; *see also* Dunaway Dec. ¶¶ 8, 11 (after alerting Human Resources that her "supervisor changed [her] time sheet to reflect fewer hours than actually worked[,] Human Resources responded that managers could override the time on time sheets."); Forrest Dec. ¶ 7 (supervisor rejected attempts to report overtime worked). Thus, Morgan Stanley's "official" policy of requiring payment for overtime work is about as valuable as the paper upon which it was written.

---

[3] The pressure on CSAs not to report overtime is entirely consistent with the otherwise well-known and publicized efforts by Morgan Stanley to reign in costs, efforts that have led to layoffs and other fiscal constraints. http://www.foxbusiness.com/industries/2011/ 12/15/layoff-list-grows-morgan-stanley-to-cut-1600-jobs/ (announcing 1600 layoffs on December 15, 2011); http://www.reuters.com/article/ 2012/07/19/us-morganstanley-earnings-idUSBRE86I0K120120719 (announcing another 1000 layoffs on July 19, 2012 with intent to reduce workforce by 7% companywide); http://www.zacks.com/stock/ news/80674/morgan-stanley-plans-layoffs (announcing plans to eliminate 120 complexes).

In short, although, as discussed below, the merits of the claims in this case are not presently before the Court, the evidence demonstrates a consistent pattern of wrongdoing by Defendants in nine states, shows a common policy to violate the FLSA, and is strongly probative of the fact there are other "similarly situated" CSAs at Morgan Stanley's branches.  The result is the same across the country -- Morgan Stanley is extracting additional hours from its CSA workforce without compensating them for it. For purposes of conditional certification, the experiences of the Plaintiffs, opt-ins and declarants are sufficient to illustrate that this was a "common practice or policy."  Here, however, we have additional evidence in the form of testimony that Morgan Stanley's policy affected other CSAs.  *See* Amador Dep. (Exh. B) at 75:11-17 (all CSAs were told "the standard -- the way Morgan Stanley worked is you worked overtime.  If you worked overtime, [ ] you are only allowed to put from 8:30 to 5:00.  That was what we were asked to put in on the last meeting that I had with [my supervisor] and all the CSAs."); Cetina Dep. (Exh. C) at 71:11-14 (Morgan Stanley "just [has the] kind [of] culture [ ] where it's okay, it's actually expected of you to stay after hours and get work completed and get ready for the next day."); McGrath Dep. (Exh. F) at 142:5-6 ("I know for a fact that [the other CSAs] did work [overtime]."); Goldman Dep. (Exh. E) at 34:7-9 (stating that other CSAs regularly worked overtime); Roberts Dep. (Exh. I) at 157:3 (working overtime without being compensated is "company policy"); Sunkett Dep. (Exh. D) at 57:4, 62:12-63:11 (CSAs "were all overworked. . . . It was normal [for them to work through lunch] several times a week …"); Pierce Dep. (Exh. H) at 168:11-16 (working overtime and not being compensated was "standard practice"); *see also* Dunaway Dec. ¶ 6 ("weekly overtime hours worked were not to be recorded, per Morgan Stanley policy

and practice"); Forrest Dec. ¶ 5 (same); Fulk Dec. ¶¶ 6, 10 ("Morgan Stanley's policy []

required CSA's to work off-the-clock overtime hours"); *Hertz*, 624 F.3d at 554-55.  In

fact, Plaintiffs, Opt-Ins and Declarants can provided names of other CSAs who worked

overtime without being compensated.  *See* Amador Dep. (Exh. B) at 235; Cetina Dep.

(Exh. C) at 182; McGrath Dep. (Exh. F) at 130; Pierce Dep. (Exh. H) at 23:16-24:2; *see*

*also* Dunaway Dec. ¶ 16; Forrest Dec. ¶ 14.

      Accordingly, as is next addressed, Plaintiffs have met their minimal burden for

the Court to grant the present motion and conditionally certify this case as a collective

action.

## II.    ARGUMENT

### A.    The Remedial Purposes of the FLSA Warrant Prompt and Accurate Notice to Potential Collective Action Members

      The FLSA specifically provides that any employer who fails to pay its employees

required overtime compensation:

> [s]hall be liable to the employee or employees affected in the amount of . . .
> their unpaid overtime compensation, . . . and an additional equal amount as
> liquidated damages.

29 U.S.C. § 216(b).  The statute also provides for collective actions to recover such

damages "by any one or more employees for or in behalf of himself or themselves and

other employees similarly situated."  *Id.*

      Pursuant to 29 U.S.C. § 216(b), and unlike Rule 23 class actions, an individual

who wishes to join a collective action must file with the Court a written consent that the

action may proceed on his behalf within the applicable statute of limitations.[4]  *Id.*  "FLSA

---

[4] An action seeking unpaid overtime compensation and liquidated damages must be
commenced within two years or, where the action arises out of a willful violation of the
statute, within three years.  29 U.S.C. § 255(a).

actions are, consequently, not true representative actions as under Rule 23, but instead those actions brought about by individual employees who affirmatively join a single suit." *Raniere v. Citigroup, Inc.,* 827 F. Supp. 2d 294, 313 (S.D.N.Y. 2011). Thus, "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b); Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 1807, 468-69 (3d ed. 2005).

Until an absent collective action member opts-in, the statute of limitations is running against him. 29 U.S.C. § 255(a); *Gortat v. Capala Brothers, Inc.*, 2010 U.S. Dist. LEXIS 35451, at *30 (E.D.N.Y. Apr. 9, 2010). It is thus important that notice be given promptly to preserve the claims of collective action members and, it is not uncommon for courts to approve expedited notice. *See Hoffmann v. Sbarro Inc.*, 982 F. Supp. 249, 262 (S.D.N.Y. 1997) (Sotomayor, *J.*); *Braunstein v. Eastern Photographic Labs., Inc.*, 600 F.2d 335, 336 (2d Cir. 1978).

In *Hoffmann-LaRoche, Inc. v. Sperling*, 493 U.S. 165 (1989), the Supreme Court recognized the importance of collective members' receiving "accurate and timely" notice about a pending FLSA action so that they can take action. The "collective action" mechanism provides individuals with "the advantage of lower individual costs to vindicate rights by the pooling of resources." *Id.* at 170. Even though § 216(b) does not require parties to obtain judicial approval before seeking to advise other similarly situated persons of their FLSA rights, district courts, including most specifically this Court (which grants most § 216(b) motions), routinely expedite and facilitate notice to potential opt-in plaintiffs by "conditionally certifying" the § 216(b) collective. *See Hertz*, 624 F.3d at

554.  Conditional certification furthers the FLSA's "broad remedial purpose,"

*Braunstein*, 600 F.2d at 336; *accord Hoffman*, 982 F. Supp. at 262-63, and is justified by

the court's "managerial responsibility to oversee the joinder of additional parties to assure

that the task is accomplished in an efficient and proper way."  *Hoffman-LaRoche*, 493

U.S. at 170-71; *Fasanelli v. Heartland Brewery, Inc.*, 516 F. Supp. 2d 317, 321

(S.D.N.Y. 2007) ("when determining whether a matter shall proceed as a collective

action, courts should be mindful of the remedial purposes of the FLSA").  As observed

by the Supreme Court, the benefits of a § 216(b) collective action "depend[ ] on

employees receiving accurate and timely notice concerning the pendency of the collective

action, so that they can make informed decisions about whether to participate."  *Hoffman-

LaRoche*, 493 U.S. at 170; *accord, e.g.*, *Hertz*, 624 F.3d at 554.

> **B.      Plaintiffs Have More Than Satisfied the Lenient Standards for
>          Conditional Certification and Notice to the Potential Collective Action
>          Members**

The sole requirement for granting a motion for conditional certification and

authorizing notice is whether potential opt-ins are "similarly situated" to the named

plaintiff.  *Cohen v. Gershon Lehrman Group*, 686 F. Supp. 2d 317, 326 (S.D.N.Y. 2010);

*see also Hertz*, 624 F. 3d at 555.  This is only a preliminary determination because, as the

Second Circuit recognized, in this Circuit, courts "have coalesced around a two-step

method, a method which, while again not required by the terms of FLSA or the Supreme

Court's cases, we think is sensible."  *Hertz*, 624 F.3d at 554-55; *see also Ibea v. Rite Aid

Corp.*, 2011 U.S. Dist. LEXIS 144652, at *3-4 (S.D.N.Y. Dec. 14, 2011) (citing

numerous authorities as to this Circuit's cases).  "The first step involves the court making

an initial determination to send notice to potential opt-in plaintiffs who may be 'similarly

situated' to the named plaintiffs with respect to whether a FLSA violation has occurred."

*Hertz*, 624 F.3d at 555 (citing *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233,

1258-62 (11th Cir. 2008); *Damassia v. Duane Reade, Inc.*, 2006 U.S. Dist. LEXIS 73090,

at *3 (S.D.N.Y. Oct. 4, 2006) (Lynch, *J.*); *Hoffman*, 982 F. Supp. at 261 (Sotomayor, *J.*)).

"The court may send this notice after plaintiffs make a 'modest factual showing' that they

and potential opt-in plaintiffs 'together were victims of a common policy or plan that

violated the law.'" *Hertz*, 624 F.3d at 555 (citing *Hoffman,* 982 F. Supp. at 261)).

Specifically, the Second Circuit explained how the plaintiffs' burden of showing

"similarly situated" individuals is minimal:

> The "modest factual showing" cannot be satisfied simply by "unsupported
> assertions," but it should remain a low standard of proof  because the purpose
> of this first stage is merely to determine whether "similarly situated" plaintiffs
> do in fact exist . . . .

*Id*. (emphasis in original; citation omitted).

The standard, accordingly, is a lenient one and "the court 'typically grants

conditional certification.'"  *Ravenell v. Avis Budget Car Rental, LLC*, 2010 U.S. Dist.

LEXIS 72563, at *5 (E.D.N.Y. July 19, 2010) (citing *Malloy v. Richard Fleischman &

Assocs. Inc.*, 2009 U.S. Dist. LEXIS 51790, at *5 (S.D.N.Y. June 3, 2009)).   As Justice

Sotomayor wrote, at this stage, "[t]he burden on plaintiff is not a stringent one, and the

Court need only reach a preliminary determination that plaintiffs are similarly situated."

*Hoffman*, 982 F. Supp. at 261; *accord*, *e.g.*, *Bowens v. Atl. Maint. Corp.*, 546 F. Supp. 2d

55, 82 (E.D.N.Y. 2008) ("FLSA's opt-in provision merely provides an opportunity for

potential plaintiffs to join and is only a preliminary determination as to which potential

plaintiffs may in fact be similarly situated") (citations omitted).  The burden on a

plaintiff, accordingly, is light.  *See Cabrera v. 211 Garage Corp.*, 2008 U.S. Dist. LEXIS

76050, at *4 (S.D.N.Y. Aug. 22, 2008) ("[p]laintiffs' burden of showing other potential

class members are 'similarly situated' is not onerous at this stage of the litigation")

(citations omitted); *In re Penthouse Exec. Club Comp. Litig.*, 2010 U.S. Dist. LEXIS

114743, at *7 (S.D.N.Y. Oct. 26, 2010) (describing plaintiff's threshold requirements as

"very low" or "minimal"); *Cunningham v. Elec. Data Sys. Corp.*, 754 F. Supp. 2d 638,

643-44 (S.D.N.Y. 2010) ("the modest factual showing . . . should remain a low standard

of proof").

It is at "the second stage [that] the district court will, on a fuller record, determine

whether a so-called collective action may go forward by determining whether the

plaintiffs who have opted in are in fact similarly situated to the named plaintiffs." *Hertz*,

624 F.3d at 555; *accord Winfield*, 843 F. Supp. 2d at 402 n.3 ("the case law is clear that a

heightened standard is not appropriate during the first stage of the conditional

certification process and should only be applied once the entirety of discovery has been

completed."); *Gjurovich v. Emmanuel's Marketplace, Inc.*, 282 F. Supp. 2d 101, 105

(S.D.N.Y. 2003) ("Should it become clear later that the parties who have opted-in are not

similarly situated to the Plaintiff here, I will make any rulings that are necessary and

appropriate to ensure that the case is properly formed.").  Thus, the term "[conditional

certification] is a misnomer and may obfuscate the leniency of the standard employed to

authorize plaintiffs' counsel to send notices of the action."  *Morangelli v. Chemed Corp.*,

275 F.R.D. 99, 104 n.1 (E.D.N.Y. 2011).

There are good reasons why the first stage burden is low.  Inasmuch as claims are

not tolled until an individual files a consent to join an action, as Judge Glasser cogently

explained:

> Because the statute of limitations for FLSA claims continues to run for each individual plaintiff until he or she opts in, see 29 U.S.C. § 216(b), early certification and notice are favored in order to protect plaintiffs' rights. Thus, only a minimal evidentiary burden is imposed in order to satisfy the "similarly situated" requirement . . . . The heightened scrutiny standard is only appropriate after the opt-in period has ended and the court is able to examine whether the actual plaintiffs brought into the case are similarly situated. It would not sensibly serve the purposes of a two-step scheme to impose on plaintiffs a heightened burden of proving that as-yet-unknown plaintiffs are similarly situated.

*Gortat*, 2010 U.S. Dist. LEXIS 35451, at *34-35; *accord*, *e.g.*, *Cunningham*, 754 F. Supp. 2d at 645; *Raniere*, 827 F. Supp. 2d at 320-21.

Concomitant with the minimal burden and the fact that the members of the collective action are not yet before the court, at the conditional certification stage "the court does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations." *Cunningham*, 754 F. Supp. 2d at 644 (internal citations omitted); *accord Winfield*, 843 F. Supp. 2d at 402. The Court therefore does not weigh the merits of the underlying claims in determining whether potential opt-ins are similarly situated. *Fasanelli*, 516 F. Supp. 2d at 322 ("To the extent that Defendants' opposition relies on a detailed factual dispute about whether the Defendants maintain an 'illegal off-the-clock' policy, 'illegal tip retention' policy, or fail to pay the minimum wage, that inquiry is misplaced as those issues go to the merits of the case."); *Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 2d 346, 354 (E.D.N.Y. 2008) ("the focus is not on whether there has been a violation of the law, but on whether the proposed plaintiffs are 'similarly situated' with respect to their allegations . . . ."); *Jason v. Falcon Data Com, Inc.*, 2011 U.S. Dist. LEXIS 77352, at *16 (E.D.N.Y. July 18, 2011)

(defendants' argument that the common policy did not violate the law is ultimately a merits argument and is unpersuasive at first-stage).[5]

Plaintiffs need not present a substantial record at this initial stage. Courts in this Circuit regularly grant conditional certification on such evidence as the complaint, *see e.g.*, *Doucoure v. Matlyn Food, Inc.*, 554 F. Supp. 2d 369, 374 (E.D.N.Y. 2008) (finding that plaintiff's "well-pleaded allegations," and nothing more, were sufficient to justify mailing notice to potential collective action members), based on the complaint and one or two affidavits, *see, e.g.*, *Zheng Fang v. Yongjing Zhuang*, 2010 U.S. Dist. LEXIS 133618, at *7-*8 (E.D.N.Y. Dec. 11, 2010); *Gjurovich*, 282 F. Supp. 2d at 107; *Iriarte v. Redwood Deli & Catering, Inc.*, 2008 U.S. Dist. LEXIS 50072 (E.D.N.Y. June 30, 2008), or very little more. *See*, *e.g.*, *Aros v. United Rentals, Inc.*, 269 F.R.D. 176 (D. Conn. 2010) (one named plaintiff deposition, one corporate representative deposition, and some company-wide documents); *Marcus v. Am. Contract Bridge League*, 254 F.R.D. 44 (D. Conn. 2008) (two affidavits); *Holbrook v. Smith & Hawken, Ltd.*, 246 F.R.D. 103 (D. Conn. 2007) (one named plaintiff declaration and job descriptions); *Khalil v. Original*

---

[5] That is why certification is appropriate even when, as may occur here, defendants submit declarations from other employees or try to controvert the merits allegations. *See*, *e.g.*, *Winfield*, 2012 U.S. Dist. LEXIS 16449, at *25 n.6 ("courts in this Circuit regularly conclude that [defendant's] declarations do not undermine the plaintiffs' showing in the first stage of the conditional certification process."); *In re Penthouse Executive Club Comp. Litig.*, 2010 U.S. Dist. LEXIS 114743, at *12 (defendants' submission of competing affidavits "amounts to a premature request to make credibility determinations and factual findings, something that is inappropriate at the notice stage."); *Aros*, 269 F.R.D. at 179 (refusing to consider defendant's declarations); *Alli v. Boston Market*, 2011 U.S. Dist. LEXIS 101530, at *15-16 (D. Conn. Sept. 8, 2011) (same); *see also Creely v. HCR Manorcare*, 789 F. Supp. 2d 819, 840 (N.D. Ohio 2011) (dismissing 35 "happy camper" declarations submitted by defendant as "of little use" on a Section 216(b) motion); *see also Damassia*, 2006 U.S. Dist. LEXIS 73090, at *21-22. The proper time for consideration of such rebuttal evidence would be at the second stage. *See Craig v. Rite Aid Corp.*, 2009 U.S. Dist. LEXIS 114785, at *9 (M.D. Pa. Dec. 9, 2009) ("[S]hould further discovery reveal that the named positions, or corresponding claims, are not substantially similar . . . the court will have the opportunity to deny final certification.").

*Homestead Rest.*, 2007 U.S. Dist. LEXIS 70372, at *3 (S.D.N.Y. Aug. 9, 2007)

(pleadings, one affidavit, and a consent form); *Sipas v. Sammy's Fishbox, Inc.*, 2006 U.S.

Dist. LEXIS 24318, at *8 n.2 (S.D.N.Y. Apr. 24, 2006) (pleadings and three affidavits);

*Legrand v. Educ. Mgmt. Corp.*, 2004 U.S. Dist. LEXIS 17696, at *4 (S.D.N.Y. Sept. 1,

2004) (same); *Cabrera*, 2008 U.S. Dist. LEXIS 67050, at *5 (same).

　　　　As here relevant, with eleven CSA witnesses who worked at thirteen branches in

nine states and supporting documentary evidence, the record well exceeds that in other,

similar recent nationwide cases that have been conditionally certified in this Circuit.  *See*

*Winfield*, 843 F. Supp. 2d 397 ("off-the-clock" nationwide conditional certification, based

on testimony of six Citibank Personal Bankers and documentary evidence); *Hernandez v.*

*Merrill Lynch & Co.*, 2012 U.S. Dist. LEXIS 49822 (S.D.N.Y. Apr. 6, 2012) (same,

based on seven affidavits of Merrill Lynch's Financial Solutions Advisors); *Zivali v.*

*AT&T Mobility LLC*, 646 F. Supp. 2d 658, 661-62 (S.D.N.Y. 2009) (same, based on six

declarations, for multiple retail positions); *see also Hanchard-James v. Brookdale Family*

*Care Ctrs.*, 2012 U.S. Dist. LEXIS 113118 (E.D.N.Y. Aug. 9, 2012) (conditional

certification based on one affidavit for nurses); *see also Adams v. Inter-Con Sec. Sys.*,

242 F.R.D. 530, 537 (N.D. Cal. 2007) ("[f]or conditional certification, plaintiffs do not

need to provide evidence that every facility relevant to the proposed class maintains an

illegal policy. . . Rather, the named plaintiff must demonstrate that there existed at least

one similarly situated person at a facility other than his own.").

　　　　Given the pleadings, Morgan Stanley's own documents, and the relevant portions

of the depositions and declarations, Plaintiffs more than satisfy their "lenient" burden of

demonstrating that the proposed collective is sufficiently similarly situated to justify

issuing notice.  Plaintiffs have provided ample facts to show Morgan Stanley's common policy and practice of depriving CSAs of compensation for all overtime worked.  The evidence, supported not just by declarations, but also with deposition testimony and Defendants' documents, encompasses thirteen Morgan Stanley branches in nine states. *See supra* at pages 3-12; *see Ruggles v. Wellpoint*, 591 F. Supp. 2d 150, 161 (N.D.N.Y. 2008) (in granting conditional certification of a nationwide class, court found persuasive the fact that plaintiffs submitted affidavits from seven of the fourteen states where defendant had call centers).

Evidence, beyond a modest showing, demonstrates how CSAs were required to work over 40 hours in a workweek to meet the demands of their jobs and satisfy Morgan Stanley's clients, but were not paid for this overtime.  As already discussed at pages 4-12, there is substantial evidence that pursuant to a corporate policy, Morgan Stanley branch managers and other supervisors: (a) told CSAs not to record overtime, even when they knew that CSAs were working overtime hours; (b) altered time records evidencing overtime to reflect only a 40 hour workweek; (c) demanded that CSAs who submitted overtime change their own timesheets; and/or (d) created a climate that intimidated CSAs into not asking for overtime that they had actually worked.  *See Hernandez*, 2012 U.S. Dist. LEXIS 49822, at *3-8 (granting nationwide conditional certification in "off-the-clock" with similar evidence involving non-exempt bank employees).  As also discussed at pages 4-12, above, the three Plaintiffs, five opt-ins, and three declarants, who worked at many different branches nationwide, have similarly detailed how they were not paid for all overtime hours worked.  Some even testify how they witnessed or have knowledge that other CSAs worked more than 40 hours per week without being paid, all of which

more than meets Plaintiffs' minimal burden for this Motion.  *See* Amador Dep. (Exh. B) at 75:11-17; Cetina Dep. (Exh. C) at 71:11-14; McGrath Dep. (Exh. F) at 142:5-6; Goldman Dep. (Exh. E) at 34:7-9; Roberts Dep. (Exh. I) at 157:3; Sunkett Dep. (Exh. D) at 57:4; Pierce Dep. (Exh. H) at 108:23-25; *see also* Dunaway Dec. ¶ 16; Forrest Dec. ¶ 14.  And, in addition to the consistent testimony of the Plaintiffs, Opt-Ins and Declarants, there is a uniform job description, along with other Morgan Stanley documents, showing that CSAs generally had uniform duties and responsibilities, and were subject to a uniform, corporate compensation plan.  *See* Amador Dep. (Exh. B) at 117:20-118:11; Cetina Dep. (Exh. C) at 83:19-90:8; McGrath Dep. (Exh. F) at 60:11-17, 22-23; Goldman Dep. (Exh. E) at 55:10-20, 56:12-18, 64:8-18; Monfils Dep. (Exh. G) at 34:18-35:3, 59:19-25, 62:5-19; Roberts Dep. (Exh. I) at 58:8-16; Sunkett Dep. (Exh. D) at 37:10-16; Pierce Dep. (Exh. H) at 26:12-14, 46:1-16, 47:9-50:10; Dunaway Dec. ¶¶ 14-15 ("all CSAs performed the same or similar primary duties[ and] . . . were paid according to a similar compensation system"); Forrest Dec. ¶¶ 12-13; Fulk Dec. ¶ 12; Lesser Dec. (Exh. M) (job description); *Gilbert v. Citigroup, Inc.*, 2009 U.S. Dist. LEXIS 18981, at *12-13 (N.D. Cal. Feb. 18, 2009) (certifying nationwide "off-the-clock" collective of business banking officers where plaintiff only submitted declarations from five individuals, all from California, and evidence that the position was subject to the same compensation plan).

Indeed, in a very similar "off-the-clock" case involving Citibank's Personal Bankers, Judge Koeltl just this year conditionally certified a nationwide collective action based on evidence nearly identical to that  presented here:  (1) testimony from six collective action members showing "off-the-clock" overtime work at a number of

branches; (2) a "dual-edged" policy of maintaining demanding job requirements that cannot be completed in a 40 hour week along with a policy to strictly limit overtime compensation unless pre-approved; (3) instruction from supervisors to collective action members not to record all hours worked; and, (4) evidence showing that the company created a climate that intimidated employees  into not submitting for overtime that they had actually worked.  *See Winfield*, 843 F. Supp. 2d at 400-01, 403-05.  As Judge Koeltl recognized, while "defendant emphasizes that it has a written policy requiring that all overtime hours worked be recorded and paid . . . the existence of a formal policy that is facially unlawful is not a prerequisite for conditional certification.  Instead, it is sufficient to show that a facially lawful policy was implemented in an unlawful manner, resulting in a pattern or practice of FLSA violations."  *Id.* at 405.

Similarly, in *Hernandez*, 2012 U.S. Dist. LEXIS 49822, at *12-14, another recent Southern District of New York decision akin to the present case, Judge Forrest certified a nationwide "off-the-clock" collective action based upon seven affidavits from Merrill Lynch's Financial Services Advisors who attested that they "were not always compensated for overtime worked" and "that overtime was effectively required in order to meet the [employer's] performance goals . . . regardless of any policies that [the employer] had about the requisite work week or overtime."

Likewise, in *Levy v. Verizon Info. Servs.*, 2007 U.S. Dist. LEXIS 43223, at *4-5 (E.D.N.Y. 2007), the court conditionally certified a class of telephone sales representatives, who, like Plaintiffs here, were subjected to a dual-edged policy of requiring them to work overtime while "officially" discouraging any overtime that was not pre-authorized:

> managers required that sales representatives be paid for overtime hours only if such payment was 'pre-approved' -- a policy that resulted in few if any overtime payments.  Yet employees often arrived early, worked beyond their shifts and during breaks, and took work home.  These practices were the norm, and they were encouraged by Verizon policies and practices.

The court in *Verizon* aptly recognized, quoting Department of Labor regulations, that the "correct liability standard under the FLSA" does not mean individuals must show that they were required to work overtime, only that they were permitted to work unpaid overtime.  *Id*. at *14 n.2 ("even if an employer does not want work to be performed by an employee, it 'cannot sit back and accept the benefits without compensating for them.' 29 C.F.R. § 785.13.  Indeed, 'it is the duty of management to exercise its control and see to it that the work is not performed . . . .'").  As noted, Morgan Stanley had no policy or procedure in place to prevent CSAs from working overtime and, to the contrary, they were specifically instructed not to report overtime hours that were already worked.

In light of the foregoing, Plaintiffs have well exceeded the lenient burden necessary to grant a motion for conditional collective action certification.

> **C.    The Court Should Order that Notice Be Sent to Potential Collective Action Members and Order Defendants to Produce Complete Contact Information for CSAs**

Based on the foregoing, the Court should authorize notice.  *See Hertz*, 624 F.3d at 555; *Winfield*, 843 F. Supp. 2d at 400-05; *Hernandez*, 2012 U.S. Dist. LEXIS 49822, at *12-14; *Zivali*, 646 F. Supp. 2d at 661-62; *Hanchard-James*, 2012 U.S. Dist. LEXIS 113118, at *4-7, 10-11; *Gilbert*, 2009 U.S. Dist. LEXIS 18981, at *5-7.  Plaintiffs will undertake to meet and confer with Defendants on the form of notice to be sent.  In order for Plaintiffs to provide notice of the action, Plaintiffs request that Morgan Stanley produce the names and updated contact information for these individuals who were

employed as CSAs within three years from the date of the Court's order. *See Hoffman-La Roche*, 493 U.S. at 170; *Stevens v. HMSHost Corp.*, 2012 U.S. Dist. LEXIS 146150, at *12 (E.D.N.Y. Oct. 10, 2012) ("At the conditional certification stage, prior to discovery on the issue of willfulness, courts ordinarily refuse to determine willfulness and authorize notice to cover the past three years."); *Patton v. Thomson Corp.*, 364 F. Supp. 2d 263, 266 (E.D.N.Y. 2005) (same).

Accordingly, in addition to certifying the collective action, Plaintiffs request that the Court also order Defendants to produce to Plaintiffs the following within 21 days of its order:

> A list, in electronic format, of all persons employed by Defendants as Client Services Associates, three years from the date of the order to the present including: names, addresses, telephone numbers, e-mail addresses, work locations, and dates of employment.

*See*, *e.g.*, *Hernandez*, 2012 U.S. Dist. LEXIS 49822, at *22; *Raniere*, 827 F. Supp. 2d at 327-28; *Vaughn v. Mortgage Source, LLC*, 2010 U.S. Dist. LEXIS 36615, at *29-30 (E.D.N.Y. Apr. 14, 2010); *Young v. Cooper Cameron Corp.*, 229 F.R.D. 50, 56-57 (S.D.N.Y. 2005); *Moore v. Eagle Sanitation, Inc.*, 2011 U.S. Dist. LEXIS 77126, at *14 (E.D.N.Y. July 18, 2011).

Plaintiffs also request that the Court order Defendants to post the notice and consent forms in a conspicuous place at all work locations of potential collective action members. *See, e.g.*, *Harhash v. Infinity West Shoes, Inc.*, 2011 U.S. Dist. LEXIS 96880, at *17 (S.D.N.Y. Aug. 24, 2011) ("Courts in this District routinely order that Notice be posted in common areas or employee bulletin boards, even when notice is also provided via first-class mail."); *Whitehorn v. Wolfgang's Steakhouse, Inc.*, 767 F. Supp. 2d 445, 449 (S.D.N.Y. 2011) (Sand, *J.*) (same; collecting cases).

24

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court: (1) conditionally certify this case as a collective action; (2) order Defendants to produce a computer-readable data file containing all potential collective action members' names, last known mailing addresses, last known telephone numbers, last known email addresses, work locations, and dates of employment; and (3) order Defendants to post in a conspicuous place the notice and consent forms at the work locations of all collective action members.

Dated: November 7, 2012
Rye Brook, New York                    Respectfully submitted,

By: ___s/Seth R. Lesser_____
Seth R. Lesser
Fran L. Rudich
Michael J. Palitz
KLAFTER OLSEN & LESSER LLP
Two International Drive, Suite 350
Rye Brook, New York 10573
Telephone: (914) 934-9200

Gregg I. Shavitz
Susan H. Stern
SHAVITZ LAW GROUP, P.A.
1515 South Federal Highway
Boca Raton, Florida 33432
Telephone: (561) 447-8888

Attorneys for Plaintiffs and Opt-in Plaintiffs