Thomas A. Linthorst (TL-3345)
tlinthorst@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, New York 10178
(212) 309-6000 (Telephone)
(212) 309-6001 (Fax)

Christopher K. Ramsey *(admitted pro hac vice)*
Stephanie R. Reiss *(admitted pro hac vice)*
cramsey@morganlewis.com
sreiss@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Oxford Centre, 32nd Floor
301 Grant Street
Pittsburgh, PA  15219-6401
412.560.3300
412.560.3001 (fax)
Attorneys for Defendants

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

PHILIPS AMADOR,
SYLVESTER CETINA, and JOANN
SUNKETT, individually and on behalf of
others similarly situated,

        Plaintiffs,

        v.

MORGAN STANLEY & CO. LLC, f/k/a
Morgan Stanley & Co. Incorporated,
MORGAN STANLEY SMITH BARNEY
LLC, and MORGAN STANLEY,

        Defendants.

**No.:  11-cv-4326-RJS**

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF CONDITIONAL CERTIFICATION AND NOTICE PURSUANT TO 29 U.S.C. § 216(b)

# **TABLE OF CONTENTS**

Page

I.    INTRODUCTION ........................................................................................ 1

II.    STATEMENT OF FACTS .......................................................................... 3

    A.    The Defendants, The Branch Network, And The CSA Positions. ............................ 3

    B.    Defendants Required CSAs To Record And Be Paid For All Time Worked. ........... 4

    C.    Plaintiffs' Individual Allegations. ................................................................. 6

    D.    Case History. ........................................................................................ 7

III.    ARGUMENT .............................................................................................. 7

    A.    The Court Should Exercise Its Discretion To Deny Collective Action Certification. ............................................................................................ 7

    B.    Under Circumstances Similar To Those In This Case, Courts Have Denied Conditional Certification. .......................................................................... 12

    C.    Plaintiffs And The Putative Class Of CSAs Are Not Similarly Situated. ............... 14

    D.    The Cases Cited By Plaintiffs Are Readily Distinguishable. ............................... 22

    E.    If This Court Were to Permit Any Further Notice, Which It Should Not, It Should be Limited Only to the Plaintiffs' Branches. .......................................... 23

    F.    The Notice Requested By Plaintiff Is Inappropriate. ....................................... 25

IV.    CONCLUSION ........................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Alli v. Boston Mkt. Co.,
  2011 WL 4006691 (D. Conn. Sep. 8, 2011) ............................................................................25

Barfield v. N.Y. City Health & Hosps. Corp.,
  2005 WL 3098730 (S.D.N.Y. Nov. 18, 2005) .........................................................................9

Basco v. Wal-Mart Stores, Inc.,
  2004 WL 1497709 (E.D. La. July 2, 2004) ............................................................................14

Brickey v. Dolgencorp, Inc.,
  272 F.R.D. 344 (W.D.N.Y. Feb. 23, 2011) .......................................................................13, 21

Brown v. ScriptPro, LLC,
  -- F.3d --, 2012 WL 5908771 (10th Cir. Nov. 27, 2012) ......................................................14

Brumbelow v. Quality Mills, Inc.,
  462 F.2d 1324 (5th Cir. 1972) ...............................................................................................14

Burkhart-Deal v. CitiFinancial, Inc.,
  2010 WL 457127 (W.D. Pa. Feb. 4, 2010) ............................................................................24

Campbell v. Pricewaterhouse Coopers, LLP,
  2008 WL 2345035 (E.D. Cal. June 5, 2008) .........................................................................24

Camper v. Home Quality Mgmt. Inc.,
  200 F.R.D. 516 (D. Md. 2000) ...............................................................................................24

Carey v. 24 Hour Fitness USA, Inc.,
  2012 WL 4857562 (S.D. Tex. Oct. 11, 2012) ........................................................................13

Castle v. Wells Fargo Fin., Inc.,
  2008 WL 495705 (N.D. Cal. Feb. 20, 2008) .........................................................................13

Colozzi v. St. Joseph's Hosp. Health Ctr.,
  595 F. Supp. 2d 200 (N.D.N.Y. 2009) ...................................................................................25

Davis v. Charoen Pokphand (USA), Inc.,
  303 F. Supp. 2d 1272 (M.D. Ala. 2004) ................................................................................10

Davis v. J.P. Morgan Chase & Co.,
  587 F.3d 529 (2d Cir. 2009) ...................................................................................................12

Diaz v. Elecs. Boutique of Am., Inc.,
  2005 WL 2654270 (W.D.N.Y. Oct. 17, 2005) .......................................................................13

Eng-Hatcher v. Sprint Nextel Corp.,
    2009 WL 7311383 (S.D.N.Y. Nov. 13, 2009) ..................................................12, 23

Fengler v. Crouse Health Found., Inc.,
    595 F. Supp. 2d 189 (N.D.N.Y. 2009) ..................................................................25

Gilbert v. Citigroup, Inc.,
    2009 WL 424320 (N.D Cal. Feb. 18, 2009)..........................................................23

Gordon v. Kaleida Health,
    2009 WL 3334784 (W.D.N.Y. Oct. 14, 2009)........................................................25

Griffith v. Wells Fargo Bank, N.A.,
    2012 WL 3985093 (S.D. Tex. Sept. 12, 2012) ......................................................17

Hens v. ClientLogic Operating Corp.,
    2006 WL 2795620 (W.D.N.Y. Sept. 26, 2006) .....................................................23

Hernandez v. Merrill Lynch & Co.,
    2012 WL 1193836 (S.D.N.Y. Apr. 6, 2012) ....................................................22, 23

Hinojos v. Home Depot, Inc.,
    2006 WL 3712944 (D. Nev. Dec. 12, 2006)........................................13, 15, 20, 22

Hintergerger v. Catholic Health Sys.,
    2009 WL 3464134 (W.D.N.Y. Oct. 21, 2009)......................................................25

Hoffman v. La-Roche Inc. v. Sperling,
    493 U.S. 165 (1989)............................................................................................8, 9

Hollander v. Am. Cyanamid Co.,
    172 F.3d 192 (2d Cir. 1999) ..................................................................................21

Jackson v. Motel 6 Multipurpose, Inc.,
    130 F.3d 999 (11th Cir. 1997) ..............................................................................10

Jones v. Qwest Commc'ns Int'l, Inc.,
    2007 WL 4179385 (D. Minn. Nov. 20, 2007) ......................................................24

Joza v. WW JFK LLC,
    2010 WL 3619551 (E.D.N.Y. Sept. 10, 2010) ................................................14, 19

Levy v. Verizon Info. Servs., Inc.,
    2007 WL 1747104 (E.D.N.Y. Jun. 11, 2007) .......................................................23

Lin v. Benihana Nat'l Corp.,
    755 F. Supp. 2d 504 (S.D.N.Y. 2010) ....................................................................9

Martinez v. Morgan Stanley & Co.,
  No. 37-2009-00103267 (Ca. Super. Ct.) ............................................... 24

Myers v. Hertz Corp.,
  624 F.3d 537 (2d Cir. 2010), cert. denied, 132 S. Ct. 368 (2011) ............................................... 8, 9

Newton v. City of Henderson,
  47 F.3d 746 (5th Cir. 1995) ............................................... 14

Prizmic v. Armour, Inc.,
  2006 WL 1662614 (E.D.N.Y. Jun. 12, 2006) ............................................... 9

Reeves v. Sanderson Plumb. Prods., Inc.,
  530 U.S. 133 (2000) ............................................... 21

Richards v. Computer Scis. Corp.,
  2004 WL 2211691 (D. Conn. Sept. 28, 2004) ............................................... 21

Richardson v. Wells Fargo Bank, N.A.,
  2012 WL 334038 (S.D. Tex. Feb. 2, 2012) ............................................... 13, 17, 22

Rudd v. T.L. Cannon Corp.,
  2011 WL 831446 (N.D.N.Y. Jan. 4, 2011) ............................................... 23

Seever v. Carrols Corp.,
  528 F. Supp. 2d 159 (W.D.N.Y. 2007) ............................................... 13, 14

Simmons v. T-Mobile USA, Inc.,
  2007 WL 210008 (S.D. Tex. Jan. 24, 2007) ............................................... 12

Singh v. City of New York,
  418 F. Supp. 2d 390 (S.D.N.Y. 2005) ............................................... 15

Singh v. City of New York,
  524 F.3d 361 (2d Cir. 2005) ............................................... 14, 15

Torres v. Gristede's Operating Corp.,
  2006 WL 2819730 (S.D.N.Y. Sept. 29, 2006) ............................................... 10

Velasquez v. HSBC Finance Corp.,
  266 F.R.D. 424 (N.D. Cal. 2010) ............................................... 17

Wal-Mart Stores, Inc. v. Dukes,
  131 S. Ct. 2541 (2011) ............................................... 15, 20

West v. Border Foods, Inc.,
  2006 WL 1892527 (D. Minn. Jul. 10, 2006) ............................................... 13

White v. Baptist Mem'l Health Care Corp.,
    699 F.3d 869 (6th Cir. 2012) ............................................................. 14

White v. Osmose, Inc.,
    204 F. Supp. 2d 1309 (M.D. Ala. 2002) ........................................... 14

Winfield v. Citibank,
    843 F. Supp. 2d 397 (S.D.N.Y. 2012) .......................................... 22, 23

Wombles v. Title Max of Ala., Inc.,
    2005 WL 3312670 (M.D. Ala. Dec. 7, 2005) ...................................... 9

Wright v. Lehigh Valley Hosp.,
    2010 WL 3363992 (E.D. Pa. Aug. 24, 2010) .................................... 12

Zivali v. AT&T Mobility LLC,
    646 F. Supp. 2d 658 (S.D.N.Y. 2009) .............................................. 11

Zivali v. AT&T Mobility LLC,
    784 F. Supp. 2d 456 (S.D.N.Y. 2011) .......................................... 11, 19

## STATUTES

29 U.S.C. § 216(b) ............................................................................... 8, 11

29 U.S.C. § 251(a)(1), (4), (7) ................................................................... 8

29 U.S.C. § 516.4 ........................................................................................ 8

Pub. L. No. 52-49, secs. 5-7, 1947 ............................................................ 8

## OTHER AUTHORITIES

DOL Opinion Letter, 1986 WL 1171134 (May 30, 1986) ............................ 4

## I.    INTRODUCTION

Plaintiffs are former Clients Service Associates, Senior Client Service Associates, Registered Associates and Senior Registered Associates (collectively "CSAs") of Defendants Morgan Stanley Smith Barney ("MSSB") and/or Morgan Stanley & Co. ("MS& Co.") who claim that they worked overtime without proper compensation, and assert claims under the Fair Labor Standards Act ("FLSA") and numerous state laws.  Plaintiffs seek to proceed as a collective action under the FLSA together with all other CSAs nationwide, going back three years.

Plaintiffs have fallen woefully short, even under a lenient standard, of demonstrating they are similarly situated to each other, much less to almost 10,000 other current and former CSAs who worked in over 1,000 individual branches, with individual branch managers, across the country.  It is Plaintiffs' burden to demonstrate that they and those they seek to join in this case are all victims of a common and unlawful policy.  Plaintiffs have been afforded ample opportunity to do so.  This motion will be heard 18 months into the case, following seven months of discovery devoted to allowing Plaintiffs to find evidence of the classwide policy and practice they allege.

Plaintiffs, however, have found no evidence of any nationwide policy and practice to deny CSAs overtime.  Rather, discovery revealed that both MSSB and MS&Co. have and had robust policies and procedures requiring that all CSAs record and be paid for all time worked, which are enforced under threat of discipline, including termination.  Every Plaintiff and most of the Opt-Ins recorded and were paid overtime, and MSSB paid millions of dollars in overtime to CSAs during the relevant period.  Since January 2010, each and every branch CSA has been required to accurately record his or her work start and stop times each day, and to certify each week as follows in a timekeeping program called MyTime:

> **I acknowledge that I have reviewed this time sheet, that it accurately reflects all of the time that I worked on the dates indicated, and that I did not work at any other times during the payroll period that are not recorded on this time sheet.**

Plaintiffs' motion is supported exclusively by 11 individual stories based on their own individual testimony specific to themselves. Plaintiffs do not even offer a theory, much less any evidence, as to how it could be determined on a common basis whether each CSA needed to work overtime (or when, or how much), whether the CSA recorded that time using the required timekeeping mechanism, whether the CSA requested permission to work overtime and whether the request was approved or denied, whether and to what extent the CSA was paid overtime, whether the alleged uncompensated work was compensable under the applicable standards, and whether the manager had actual or constructive knowledge that the CSA had engaged in compensable work without recording and being paid for it.

Plaintiffs' own testimony demonstrates that they are not similarly situated with respect to these issues. Plaintiffs themselves testified that it was possible for CSAs to complete their work without working overtime, depending on the individual. Some Plaintiffs (Sunkett and Pierce) testified they did not record their time at all, but others (Monfils and all of the CSAs they seek to join) recorded their start and stop work times to the minute each day and submitted each time record with a certification of accuracy. One Plaintiff (Goldman) claims her manager instructed her to remove overtime from her timesheet, but another (Amador) testified to having a manager that repeatedly asked him to revise his timesheet to add overtime. Plaintiffs claim that their managers turned a "blind eye" to their overtime work, but one Plaintiff (Goldman) disregarded her manager's directives to "go home." One Plaintiff (Goldman) was habitually late to work and was terminated for excessive tardiness and testified that there were occasions when she over-reported her time. Some Plaintiffs (see Sunkett, Monfils, McGrath) testified that their managers could not see them engaging in overtime work and even worked in another location altogether, and admitted that their managers would not know of the alleged overtime work. Even as they claim their experiences were pursuant to company "policy," Plaintiffs testified that under different managers, while at different

2

branches, or during different time periods, they recorded and were paid for all time worked (see McGrath, Roberts, Goldman). Were this group of 11 to proceed to trial today, each of their claims would have to be proven with their own testimony and documents, and whatever a trier of fact determined with respect to one would establish absolutely nothing about any of the others, who worked in different branches under different managers.

Sending an invitation to join to almost 10,000 individuals, when it is clear now that there is no common basis on which to adjudicate their claims, would be contrary to a statutory provision that has judicial efficiency as its paramount concern. Numerous courts – including this Court – have denied conditional certification where, as here, plaintiffs have failed to demonstrate any factual nexus that they are all victims of an illegal and common policy. Plaintiffs' Motion for Conditional Certification and Notice should be denied.

## II.     STATEMENT OF FACTS

### A.     The Defendants, The Branch Network, And The CSA Positions.

Prior to June 2009, MS&Co. operated a wealth management business through branches that employed CSAs to support the firm's Financial Advisors (FAs) and its clients. Declaration of Katherine Koutsantonis ("Kout. Decl.") ¶4. MSSB was formed in May 2009 as a joint venture between Morgan Stanley and Citigroup. Kout. Decl. ¶5. Morgan Stanley owned a bare majority (51%) of MSSB and Citigroup owned 49%. Declaration of Thomas A. Linthorst ("Linthorst Decl.") ¶20. MS&Co. employees became employees of MSSB after the joint venture.

Significantly, Plaintiffs and Opt-Ins predominantly worked at MS&Co., but those they seek to join in this case (three years from the date of any order granting notice – or January 2010 at the earliest) worked exclusively at MSSB during the relevant period. MS&Co. and MSSB are different entities and enterprises, and had significantly different overtime policies and timekeeping systems. Whereas CSAs at MS&Co. mostly kept their time using paper timesheets, which were input into the

3

system by someone else, MSSB implemented an electronic timekeeping system in which CSAs

input their own start and stop work times to the minute and submitted their time directly to the

system themselves, each time making the certification quoted above.  Kout. Decl. ¶¶16, 18, 22;

Amador Dep. 168 (excerpts from the deposition transcripts are attached to the Linthorst Declaration

unless already attached to Plaintiffs' Lesser Declaration (Dkt. No. 56)).  Moreover, some MS&Co.

full-time CSAs were scheduled to work only 37.5 hours a week even while being paid as if they

worked a full 40 hours.  Kout. Decl. ¶24.  And in January 2010, MSSB expanded its overtime

policies and made CSAs eligible for overtime even when not required by law by counting paid time

off (vacation, sick leave, holidays) towards hours worked for the week.  Kout. Decl. ¶23; See DOL

Opinion Letter, 1986 WL 1171134 (May 30, 1986).

  Over the relevant time, MSSB had over 1,000 branches across the country, most with an

individual branch manager, plus client service centers in which CSAs were not assigned to support

FAs, which together have employed almost 10,000 CSAs.  There are four different CSA positions –

Client Service Associates, Senior Client Service Associates, Registered Associates and Senior

Registered Associates – with different qualifications and job responsibilities.  Kout. Decl. ¶7.

**B.**  <u>**Defendants Required CSAs To Record And Be Paid For All Time Worked.**</u>

  CSAs at both MS&Co. and MSSB were each subject to policies and procedures that required

them to accurately record all of their time worked under penalty of discipline up to termination.  For

example, written policies in place during the past three years stated:

**Overtime**
***Employee Classification and Overtime***

All non-exempt employees are required to maintain accurate time and attendance
records.  Failure to do so may result in disciplinary action up to and including
termination.  If any third party suggests or directs that an employee submit a false
or inaccurate time sheet, the employee is required to notify Human Resources
immediately.  Firm policy prohibits retaliation against anyone who makes such a
report to human resources.

Kout. Decl. Ex. A.  Plaintiffs understood that they were required to record and be paid overtime throughout their employment.  Amador Dep. 69; Cetina Dep. 45; McGrath Dep. 72; Monfils Dep. 102-04; Roberts Dep. at 107-108; Goldman Dep. at 89-90, 94.  All CSAs also received a Code of Conduct which prohibited falsification of records, and provided multiple avenues for employees to report complaints or concerns.  Kout. Decl. Ex. B; Amador Dep. 75; Cetina Dep. 52; McGrath Dep. 79-80; Goldman Dep. 88, 119-121; Roberts Dep. 89-90.

The MyTime timekeeping software that has been in place at MSSB since January 2010 requires CSAs to accurately record their actual start and stop work times down to the minute.  Kout. Decl. ¶19.  For each week, CSAs are required to check a box approving each day's time as accurate and to verify the following:

> **I acknowledge that I have reviewed this time sheet, that it accurately reflects all of the time that I worked on the dates indicated, and that I did not work at any other times during the payroll period that are not recorded on this time sheet.  I understand that I should consult my Human Resources representative if I have any questions or concerns regarding my compensation, work hours, or the information contained on this document.**

Id. ¶18, Ex. C.

MSSB paid almost $8 million dollars in overtime to CSAs since January 2010.  Id. ¶25. Every Plaintiff and most of the Opt-Ins recorded and were paid overtime.  Id. ¶26.  CSA overtime experiences varied widely – some CSAs worked no overtime while one CSA was paid over $59,000 in overtime during this period, and over 1,750 CSAs were paid more than $1,000 in overtime during this period.  Id. ¶26.  Managers are not limited to approving overtime only for special projects, and have discretion to approve CSAs to work overtime where they believe it is warranted, even for CSAs to finish their regular work.  Id. ¶29.

C.      **Plaintiffs' Individual Allegations.**

<u>All Plaintiffs And Opt-Ins</u>.  None of the Plaintiffs or Opt-Ins could testify whether other CSAs worked overtime without compensation.  Amador Dep. 47; Cetina Dep. 77; Sunkett Dep. 88; McGrath Dep. 56; Monfils Dep. 113; Goldman Dep. 138; Roberts Dep. 147; <u>cf.</u> Pierce Dep. 170, 183 ("assumed" one other CSA worked unpaid overtime based on hearsay but could not recall the conversation and never saw pay records).  Each worked in a different location with different managers, and testified to very different stories on timekeeping and overtime, as discussed at III.C., <u>infra.</u>  Amador Dep. 30, 34 (Senior Registered CSA, who worked in one branch in Florida during the relevant period); Cetina Dep. 33-35 (unregistered CSA who worked at one branch in New York); Roberts Dep. 26 (Registered CSA in two branches in Florida); Monfils Dep. 21-22 (unregistered CSA at one branch in New Mexico); Sunkett Dep. 24 (Registered CSA for one branch in Maryland); Pierce Dep. 44, 193 (Registered CSA at client service center in Utah during the relevant period); McGrath Dep. 30, 33 (Senior Registered CSA in one branch in New Jersey); Goldman Dep. 28, 55 (unregistered CSA who worked at one branch in Florida).  And all Plaintiffs and most of the Opt-Ins separated in or before January 2010 – the earliest date of the notice period and the date MyTime was implemented and MSSB's overtime policies were changed to provide more overtime to CSAs. Amador Dep. 254-55 (terminated March 2009); Cetina Dep. 91 (left January 2010); Goldman Dep. 141 (terminated June 2009); McGrath Dep. 34 (left November 2009); Roberts Dep. 126 (last day January 2010); Sunkett Dep. 52 (left July 2009); Pierce Dep. 183 (left December 2008); Monfils Dep. 20-21 (left March 2011).  Plaintiffs and Opt-Ins thus predominantly worked at an entity (MS&Co.) and used timekeeping systems (predominantly paper time sheets) that are different than the entity (MSSB) and timekeeping system (MyTime) applicable to those they seek to join.

### D.    Case History.

On June 27, 2011, Amador filed this case as the lone plaintiff alleging a nationwide FLSA collective action.  (Dkt. No. 1).  During the relevant period, Amador worked in one branch in Florida, but his Complaint did not target a particular manager, office, region, or time period, it alleged a maximum class – the maximum number of individuals (all CSAs nationwide) for the maximum period of time allowed by the statute of limitations.  From the day after this case was filed, Plaintiff's counsel has sent a continuous series of targeted email solicitations and advertisements about this case to CSAs, providing them with a one-sided notice claiming that Morgan Stanley CSAs are not paid for all time worked.  Linthorst Decl. ¶5, Ex. 1.  Moreover, in resolution of Plaintiffs' request for a class list, Defendants also produced the names of almost 200 CSAs selected from 15 different branches from around the country, and Plaintiffs sent notice of the lawsuit to the group.  Linthorst Decl. ¶6.  The vast majority of the hundreds of individuals who have already received targeted notice about this case have declined to join or participate.

## III.    ARGUMENT

### A.    The Court Should Exercise Its Discretion To Deny Collective Action Certification.

Plaintiffs invite the Court to decide their motion under a meaningless standard that can be met in part by inadmissible evidence and with the Court considering only the Plaintiffs' evidence.  Pls' Br. 13-19 & n.5.  Plaintiffs argue that they have met this standard because they have "11 CSA witnesses" and other cases were certified with fewer numbers (Pls' Br. 19), as if certification were simply a numbers game, and as if 11 CSAs was a meaningful sample among the almost 10,000 individuals they seek to join.  The statute, and authority from the Supreme Court and Second Circuit, and the interests of judicial efficiency and due process call for a more meaningful standard before authorizing notice – one that qualitatively assesses whether, based on the record to date, the claims

7

of the Plaintiffs and those they seek to join are all bound together by a common factual nexus of unlawful conduct such that their claims for overtime can be adjudicated on a common basis.

Responding to "excessive" litigation filed after the original passage of the FLSA in 1938, Congress amended the FLSA in 1947 to provide additional protections for employers and limited FLSA actions as follows: (1) under the title of "Representative Actions Banned," Congress amended 29 U.S.C. § 216(b) to preclude representative actions, and limit FLSA actions to similarly situated individuals who have filed a consent to join the case; (2) Congress imposed a two-year statute of limitations where none had existed previously; and (3) Congress provided that the filing of an action does not stop the running of the statute unless and until an individual files a consent to join. Pub. L. No. 52-49, secs. 5-7, 1947 U.S.C. Cong. Serv. 85. Congress declared in the statute itself that the explosion of FLSA litigation threatened to "bring about financial ruin of many employers and seriously impair the capital resources of many others," and that, in the absence of these limitations, "the courts of the country would be burdened with excessive and needless litigation and champertous practices would be encouraged." 29 U.S.C. § 251(a)(1), (4), (7). See also Hoffman v. La-Roche Inc. v. Sperling, 493 U.S. 165, 173 (1989) ("The relevant amendment was for the purpose of limiting private FLSA plaintiffs to employees who asserted claims in their own right and freeing employers of the burden of representative actions."). Congress also legislated the manner and means by which employees would receive notice of their FLSA rights – requiring employers to display postings in every workplace. 29 U.S.C. § 516.4; Kout. Decl. ¶14.

The Supreme Court has authorized district courts to exercise discretion to send notice only "in appropriate cases." Hoffman-LaRoche, 493 U.S. at 170. The Court cautioned, however, that this discretion is not "unbridled," and that although "[c]ourt intervention in the notice process for case management purposes" is an appropriate use of the Court's power, "the solicitation of claims is not, and "courts must be scrupulous to respect judicial neutrality." Id. at 174. In Myers v. Hertz

8

Corp., 624 F.3d 537, 555 (2d Cir. 2010), cert. denied, 132 S. Ct. 368 (2011), the Second Circuit

affirmed the denial of Rule 23 certification of overtime claims, and declined to take appellate

jurisdiction to disturb the district court's denial of conditional certification under the FLSA. Id. at

542. The Panel, however, opined that a district court should authorize notice under the FLSA only

after plaintiffs make a "modest factual showing" that they and potential opt-in plaintiffs "together

were victims of a common policy or plan that violated the law." Id. at 555 (quotation omitted).

The touchstone for FLSA certification is judicial efficiency. Echoing the commonality

requirement under Rule 23, the Supreme Court recognized that one of the primary purposes of

allowing plaintiffs to proceed collectively is to provide the judicial system the benefit of "efficient

resolution in one proceeding of *common issues of law and fact* arising from the same alleged

[conduct]." Hoffman-LaRoche, 493 U.S. at 170 (emphasis added). Employees are similarly

situated where Plaintiffs can demonstrate through competent evidence that they are tied together by

a factual nexus and that they are all victims of an illegal and common policy, which permits their

claims to be adjudicated on a common basis, thereby saving judicial resources. See, e.g., Myers,

624 F.3d at 555; Lin v. Benihana Nat'l Corp., 755 F. Supp. 2d 504, 509 (S.D.N.Y. 2010) (there must

be a "factual nexus" with evidence "'sufficient to demonstrate that [current] and potential plaintiffs

together were victims of a common policy or plan that violated the law.'"); Prizmic v. Armour, Inc.,

2006 WL 1662614, at *2 (E.D.N.Y. Jun. 12, 2006) ("A plaintiff must provide actual evidence of a

factual nexus between his situation and those that he claims are similarly situated rather than mere

conclusory allegations"); Barfield v. N.Y. City Health & Hosps. Corp., 2005 WL 3098730, at *1

(S.D.N.Y. Nov. 18, 2005) ("anecdotal hearsay" insufficient to establish company-wide unlawful

policy). Where the court must adjudicate the claims individually, judicial efficiencies will not result

and conditional certification should be denied. Wombles v. Title Max of Ala., Inc., 2005 WL

3312670, at *5-6 (M.D. Ala. Dec. 7, 2005).

9

Plaintiffs argue that their burden is so low because "early certification" is favored due to the running of the statute of limitations. Pls' Br. 16-17. The statute of limitations is running, however, because Congress amended the statute to make it that way. More importantly, however, Plaintiffs make their argument in favor of "early certification" in a motion being heard 18 months into this case, after a seven-month discovery period expressly devoted to allowing them to find evidence of the alleged nationwide "policy and practice." "The rationale for the 'fairly lenient standard' . . . disappears, however, once plaintiffs have had an opportunity to conduct discovery with respect to defendant's policies and procedures." Davis v. Charoen Pokphand (USA), Inc., 303 F. Supp. 2d 1272, 1276 (M.D. Ala. 2004); see also Torres v. Gristede's Operating Corp., 2006 WL 2819730, at *9 (S.D.N.Y. Sept. 29, 2006) (applying heightened scrutiny where motion for conditional certification was filed after discovery had taken place).

The fact that the Court can decertify at a later date does not mitigate the harm from sending notice to such a large group without a meaningful review of whether this case will be able to proceed as a collective action. All of the Plaintiffs and Opt-ins are former employees but authorizing notice has the most significant impact on current employees – turning them into litigation adversaries with their employer and suggesting to them that their employer is violating the law. See Jackson v. Motel 6 Multipurpose, Inc., 130 F.3d 999, 1004 (11th Cir. 1997) (premature notice to a nationwide class "surely cause[s] serious and irreparable harm to [defendant]'s reputation and to its relationship with its employees."). Moreover, Defendants are then required to litigate the merits of the claims of hundreds or even over 1,000 opt-ins – often to the eve of trial – before any meaningful review is conducted of whether these individuals can proceed in this case. If it is determined that they cannot proceed in the case, the parties and the Court have wasted a tremendous amount of resources. Moreover, unlike Rule 23 certification, where individuals do not actually come into the Court, FLSA opt-ins file a consent to join and form an active attorney-client relationship. Decertification often

10

results in a multitude of individual cases. Stirring up claims that would not otherwise be filed is a result counter to the purposes of judicial efficiency behind 29 U.S.C. § 216(b).

It is a testament to these burdens that of the 24 cases Plaintiffs cite in support of granting conditional certification, 17 settled without proceeding to decertification. Linthorst Decl. ¶21. In the vast majority of cases, conditional certification becomes the <u>only</u> certification decision. Only one of those cases proceeded to a decision on decertification – <u>Zivali v. AT&T Mobility LLC</u> – which decertified the action. The experience in <u>Zivali</u> is instructive, as the Court authorized notice requiring only "substantial allegations" that the putative collective action members were similarly situated. <u>Zivali</u>, 646 F. Supp. 2d 658, 660 (S.D.N.Y. 2009). Notice went out to a nationwide class and over 4,100 individuals opted in. <u>Zivali v. AT&T Mobility LLC</u>, 784 F. Supp. 2d 456 (S.D.N.Y. 2011). The parties engaged in two more years of litigation and "extensive discovery" until May 11, 2011, when the court decertified the action. <u>Id.</u> at 456, 459. The court recognized that "timekeeping system and formal corporate policies are lawful," the opt-ins worked in a wide variety of settings, and plaintiffs had no common way to prove material elements of their claims – including employer knowledge of the overtime worked, such that proceeding would "in effect necessitate over four-thousand mini-trials, a result that is antithetical to collective action treatment." <u>Id.</u> at 459, 468. A more meaningful review as to whether the claims could be adjudicated on a common basis before sending notice could have avoided two years of litigation and "extensive discovery."

As one court aptly noted, applying a minimal and lenient standard to cases, such as this one, where extensive discovery has taken place is an "inefficient and overbroad application of the opt-in system, . . . places a substantial and expensive burden on a defendant[,] . . . is at odds with the Supreme Court's recommendation to ascertain the contours of the action at the outset, and . . . does not comport with the congressional intent behind the FLSA's opt-in requirement, which was designed to limit the potentially enormous size of FLSA representative actions . . . [and] reduce

excessive litigation spawned by plaintiffs lacking a personal interest in the outcome." Wright v.

Lehigh Valley Hosp., 2010 WL 3363992, at *3 (E.D. Pa. Aug. 24, 2010) (quotations omitted).

**B.      Under Circumstances Similar To Those In This Case, Courts Have Denied
         Conditional Certification.**

Even under a standard requiring a "modest" factual showing, Plaintiffs have not come close

to meeting their burden of showing that they and thousands of current and former CSAs nationwide

all were victims of a common unlawful policy and practice across the nationwide collective. In Eng-

Hatcher v. Sprint Nextel Corp., 2009 WL 7311383 (S.D.N.Y. Nov. 13, 2009), plaintiff alleged that

she and all other Retail Consultants (RCs) were subject to a "national *de facto* policy" of denying

RCs compensation for overtime worked, which was caused because defendants allegedly exercised

"strict control" over their labor costs, while rewarding management with lucrative bonuses for

exceeding sales targets. Id. at *3.  Judge Jones denied plaintiff's motion for conditional certification,

finding that policies "maximizing sales and minimizing overtime" were insufficient to infer that all

managers across the country were beholden to a policy to force RCs to work off-the-clock. Id. at *4.

Simmons v. T-Mobile USA, Inc., 2007 WL 210008, at *5-6, *9 (S.D. Tex. Jan. 24, 2007) (denying

certification of off-the-clock claims because plaintiff's theory about "fundamentally inconsistent

policies – maximizing sales and minimizing overtime" did not create evidence of any common

policy or plan and there were clear written policies prohibiting off-the-clock work).  Indeed,

discouraging employees from working overtime is consistent with the purposes of the FLSA. Davis

v. J.P. Morgan Chase & Co., 587 F.3d 529, 535 (2d Cir. 2009) ("The overtime requirements of the

FLSA were meant to apply financial pressure to 'spread employment to avoid the extra wage.'").

Numerous courts in this Circuit and across the country also have denied conditional

certification where the plaintiffs failed to demonstrate any common, unlawful policy or practice

because the employer, like Defendants, had implemented written policies requiring the recording

and payment of all time worked and paid significant overtime, and the plaintiffs' allegations

amounted to nothing more than that a few rogue managers disobeyed the company's directives. See,

e.g., Brickey v. Dolgencorp, Inc., 272 F.R.D. 344, 347-48 (W.D.N.Y. Feb. 23, 2011) (denying

conditional certification where stores had policies limiting hours and financially rewarding managers

who kept to the limits, holding that such "facially-lawful policies" cannot "form the equivalent of a

'common policy or plan that violate[s] the law" despite plaintiffs allegation that this created

incentives for managers to shave time or assign off-the-clock duties); Seever v. Carrols Corp., 528

F. Supp. 2d 159, 174 (W.D.N.Y. 2007) (denying nationwide conditional certification where ten

plaintiffs and a number of affiants made off-the-clock allegations as "there is little indication in the

record that the FLSA violations alleged by plaintiffs were anything other than unilateral acts by a

few 'rogue' managers . . . refusing to compensate their underlings in the manner prescribed by

Carrols' written policies"); Diaz v. Elecs. Boutique of Am., Inc., 2005 WL 2654270, at *4

(W.D.N.Y. Oct. 17, 2005) (denying certification of FLSA claims where "[P]laintiffs simply allege

that overtime work must be approved and, thus, [the company] had a policy of not paying for

overtime work.  This is insufficient to suggest that all [Assistant Store Managers] . . . were subject to

a policy of requiring but not compensating employees for overtime work.").[1]

---

[1]  See also Richardson v. Wells Fargo Bank, N.A., 2012 WL 334038, at *4 (S.D. Tex. Feb. 2,
2012) (denying conditional certification of FLSA off-the-clock claims for personal bankers where
a written policy required payment for all hours worked because, despite similar allegations from
plaintiffs, there was no evidence of a "national company-wide decision, policy or plan to deny
personal bankers overtime pay" and the "resolution of each Plaintiffs claim will require
individualized inquiries about his or her specific manager's  policies and practices"); Carey v. 24
Hour Fitness USA, Inc., 2012 WL 4857562 (S.D. Tex. Oct. 11, 2012) (denying conditional
certification off-the-clock case because whether each putative collective action member's
"[m]anager would be willing to violate the . . . written company policy against 'off-the-clock'
work also requires an [individualized] inquiry into the motivation and ethics of each . . .
[m]anager"); Castle v. Wells Fargo Fin., Inc., 2008 WL 495705, at *5 (N.D. Cal. Feb. 20, 2008);
Hinojos v. Home Depot, Inc., 2006 WL 3712944, at *1-3 (D. Nev. Dec. 12, 2006); West v. Border
Foods, Inc., 2006 WL 1892527, at *6-9 (D. Minn. Jul. 10, 2006).

C.     **Plaintiffs And The Putative Class Of CSAs Are Not Similarly Situated.**

To establish liability, Plaintiffs must prove, and the Court must determine, the following individualized issues for each CSA for each work week that he or she worked:  The number of hours worked each workweek, whether the CSA recorded that time using the required timekeeping mechanism and, if not, why not,[2] whether the CSA was directed to perform the alleged work,[3] whether the CSA requested permission to work overtime and whether the request was approved or denied,[4] whether and to what extent the CSA was paid overtime,[5] whether the alleged uncompensated work during each workweek was compensable under the applicable standards,[6] and

---

[2] See, e.g., Joza v. WW JFK LLC, 2010 WL 3619551, at *7 (E.D.N.Y.  Sept. 10, 2010) (denying overtime claims in part because employee failed to record her time on time records); Seever, 528 F. Supp. 2d at 170 (dismissing off-the-clock claims in part because of "the undisputed fact that plaintiffs never reported this work on their timesheets"); see also Brown v. ScriptPro, LLC, -- F.3d --, 2012 WL 5908771, at *7 (10th Cir. Nov. 27, 2012) ("Under these circumstances, where the employee fails to notify the employer through the established overtime record-keeping system, the failure to pay overtime is not a FLSA violation); White v. Baptist Mem'l Health Care Corp., 699 F.3d 869, 876 (6th Cir. 2012) (affirming decertification because "[u]nder the FLSA, if an employer establishes a reasonable process for an employee to report uncompensated work time the employer is not liable for non-payment if the employee fails to follow the established process.").

[3] Brumbelow v. Quality Mills, Inc., 462 F.2d 1324, 1327 (5th Cir. 1972) (affirming dismissal of off-the-clock claim where plaintiff was not directed to perform work off-the-clock, though she was directed to complete duties).

[4] Newton v. City of Henderson, 47 F.3d 746, 747, 749 (5th Cir. 1995) (reversing judgment for plaintiff where plaintiff was told not to work unauthorized overtime, but did so and turned in timesheets that did not include overtime).

[5] White v. Osmose, Inc., 204 F. Supp. 2d 1309, 1318 (M.D. Ala. 2002) ("Because [the employer] did in fact pay some overtime, it is likely that any particular [off-the-clock] claim will require specific, individualized proof as to any hours that [employer] refused to pay.").

[6] Singh v. City of New York, 524 F.3d 361, 364, 367 (2d Cir. 2005) (Sotomayor, J.) (affirming summary judgment for defendant because work time was "de minimis as a matter of law and thus not compensable under the FLSA" and recognizing that preliminary and postliminary activities are not compensable); Basco v. Wal-Mart Stores, Inc., 2004 WL 1497709, at *8 (E.D. La. July 2, 2004) (denying certification where individualized defenses included whether activities where preliminary or postliminary).

whether the manager had actual or constructive knowledge that the CSA had engaged in compensable work without recording and being paid for it.[7]

Plaintiffs do not offer any common evidence that would adjudicate <u>any</u> of these elements among <u>themselves</u> – much less <u>all</u> of the elements for the nationwide collective. Plaintiffs' references to anecdotal emails or documents pertaining to one Plaintiff simply underscores the absence of such evidence pertaining to each of the others. Indeed, Plaintiffs rest their motion in substantial part on the claimed <u>absence</u> of a class policy – that "Morgan Stanley [did not] have a policy for supervisors to ensure that all CSA work stopped before exceeding forty hours." Pls' Br. 10. This echoes the "policy *against having* uniform employment practices" at issue in <u>Wal-Mart</u>, which the Supreme Court found was "just the opposite of a uniform employment practice that would provide the commonality needed for a class action." <u>Wal-Mart Stores, Inc. v. Dukes</u>, 131 S. Ct. 2541, 2554 (2011). Moreover, this claim is untrue – Defendants had in place the requirement that a CSA seek pre-approval before working overtime so that managers could prevent a CSA from working if the manager did not want the work to be performed – a process defeated by those Plaintiffs who worked overtime without seeking approval.

As set forth below, on the elements needed to establish liability for overtime, the testimony of the Plaintiffs and Opt-ins demonstrated that these issues are individualized.

<u>Whether And To What Extent They Worked Overtime</u>. Plaintiffs lack any common basis to determine whether and to what extent any CSA had to work overtime. Plaintiffs themselves testified that it was possible that CSAs could complete their work without working overtime, depending on the individual. Amador Dep. 216 (**"I am sure some assistants completed their work"** in a 40 hour

---

[7] <u>Singh v. City of New York</u>, 418 F. Supp. 2d 390, 397 (S.D.N.Y. 2005) (fact finder must determine "how much of that time was spent with the employer's actual or constructive knowledge"), <u>aff'd</u>, <u>Singh</u>, 524 F.3d at 367; <u>Hinojos</u>, 2006 WL 3712944, at *3 (denying conditional certification where individualized inquiry would be required into whether each supervisor knew about the off-the-clock work).

week); Cetina Dep. 87-88.  Other CSAs did not need to work overtime to complete their regular

work.  Hamilton Decl, ¶ 3.[8]

Moreover, Plaintiffs testified that their purported need to work unpaid overtime was caused

by aberrational circumstances.  Amador recorded in his performance evaluation that managers relied

on him "for more than my actual primary role. I have been asked to do more and more."  Amador

Dep. 112.  He worked longer hours on IT duties because of his technical background, worked as a

CSA coach, and as the only registered CSA in his branch, he responsible for processing trades for all

20-25 FAs.  Amador Dep. 48-49, 51, 94-96.  Monfils claimed that she never had to work late or on

the weekends, but claimed that she needed to work through lunch because she spent half her day on

non-CSA operations duties in the "cage."  Monfils Dep. 53, 71, 73.  McGrath took on some duties of

the operations manager when her operations manager left and was not replaced, and her workload

increased 30% when she was assigned to support another FA.  McGrath Dep. 41-43, 48.  Roberts

supported seven FAs while covering for another CSA who was seriously ill and helping with FA

trainees, and although she was offered help on her duties – and her manager even authorized

overtime to make others available to her – she often declined the help.  Roberts Dep. 49-50, 66, 68,

70-71, 79-80, 82, 173-74.[9]  Goldman spent time working on FA tasks that her manager directed her

not to do, and redoing another CSA's work.  Goldman Dep. 61, 75-79, 101-02.  And Pierce worked

---

[8]  This and the Gilchrist and Reyes Declarations are attached to the Linthorst Declaration.  The
Court need not resolve any factual disputes to consider these declarations.  Plaintiffs testified that
they did not know whether other CSAs worked uncompensated overtime, and Plaintiffs' own
testimony about their own experiences in their branches does not conflict with testimony by other
CSAs that they had different experiences in other branches under other managers.  The
declarations do, however, belie the unsupported claim that there was a common unlawful policy
applicable to all CSAs.  Defendants are prepared to offer additional declarations but have not done
so as directed by the Court.  (Dkt. No. 60).

[9]  The emails from Robert's manager cited by Plaintiffs (Pls' Br. 7, Ex. N) stand for nothing more
than that, at times, her manager was directing her not to *work* overtime (or reminding her that she
should seek preapproval before working it).  But other times, the same manager indicated in writing
that overtime was available.  Roberts Dep. 66, 68, Ex. 1-2.

in a client service center, unlike all the other Plaintiffs and Opt-ins, and as a result was not assigned to particular FAs at all.  Pierce Dep. 45.  See Griffith v. Wells Fargo Bank, N.A., 2012 WL 3985093, at *4-5 (S.D. Tex. Sept. 12, 2012) (denying conditional certification and rejecting theory that putative class members were pressured to work off the clock because "the 'pressure' that [they] feel . . . is based on [their] individual ability to perform efficiently, subjective impression of the degree of pressure to which they are subjected, and office-specific experiences").[10]

Whether Overtime Was Requested And Approved.  Some CSAs request and are approved for overtime work, even to perform their regular job duties.  Hamilton Decl. ¶ 4; Gilchrist Decl. ¶ 4 (who works at the same location as Cetina).  Other Plaintiffs work, record, and are paid overtime without having to request approval to work that time.  Reyes Decl. ¶ 3.  Plaintiffs, however, never requested to work overtime despite being required to do so.  See Cetina Dep. 64-67.

Whether Overtime Was Recorded.  Plaintiffs claim they did not record some or all of the overtime they seek in this case, but other CSAs recorded all time worked.  Reyes Decl. ¶ 4; Gilchrist Decl. ¶ 6; Hamilton Decl. ¶ 3.  Even as to the Plaintiffs, some testified that they recorded the overtime on timesheets and were directed to remove it (Monfils Dep. 104), and others testified that they did not record the time (Sunkett Dep. 52-54, 73).[11]

---

[10]  Plaintiffs also claim that there is a "uniform job description" for all CSAs, even as they attach eight different descriptions covering the four different positions.  Pls' Br. 2-3, 21 & Ex. M.  But no job description indicates that CSAs need to work overtime, much less that they should not be compensated for it.  Richardson, 2012 WL 334038, at *4 (rejecting argument that job descriptions were "evidence of a national policy or plan" because "[n]owhere do these documents state that these duties are to be performed without compensation if done outside an employee's regular, assigned shift hours"); Velasquez v. HSBC Finance Corp., 266 F.R.D. 424, 426 (N.D. Cal. 2010) (denying conditional certification of off-the-clock claims despite uniform job description).

[11]  Plaintiffs claim that CSAs in Amador's branch were only allowed to put 8:30 to 5:00 regardless of their actual hours worked.  Pls' Br. 11.  Under cross-examination, however, Amador conceded that he didn't "know whether [Rangel] had that conversation with others or not" (190:18-24), that the "conversation was a little bit more in passing," and that "he basically stopped and said, I know

The wide variety of timekeeping practices included: Sunkett, who never recorded *any* time on a timesheet because she thought she was classified as exempt (Sunkett Dep. 52); Pierce, who claimed that his managers had to submit requests for overtime to the timekeeping system on his behalf (Pierce Dep. 90-91, Ex. 2); Monfils, who claimed she was told to just flex her hours by leaving early on Fridays so her total hours did not exceed 40 (Monfils Dep. 44)[12]; and Roberts, who testified she was able to accurately record all her overtime at one branch but not another (Roberts Dep. 156-57).  One Opt-in – Goldman – testified that even on the frequent occasions when she came in late or left early, she recorded her scheduled times (unless it was for an illness/medical appointment) and thereby over-reported her time.  Goldman Dep. 103-04, 113-116, Ex. 8.[13]

Whether Overtime Was Paid.  Plaintiffs claim that Defendants had a "no overtime policy." Pls' Br. 7.  The problem for Plaintiffs is that all of the Plaintiffs and most of the Opt-Ins recorded and were paid for overtime and MSSB has paid millions in overtime to CSAs.  McGrath alone recorded and was paid over $4,500 in just a six-month period.  McGrath Dep. 124-25, Ex. 6 at 490, 498.  To explain this fundamental inconsistency, Plaintiffs have created a fiction – that "Morgan Stanley only paid overtime when it was specifically pre-approved for special circumstances," Pls' Br. 6, but their own testimony belies this claim.  McGrath Dep. 124-25 ("I was never informed of

---

about your situation," (192:3-193:11), which Amador assumed meant he should record only his scheduled hours because he "assumed that the previous branch manager talked to him" (194:2-6).

[12]  The email Plaintiffs cite in their brief at Exhibit N of the Lesser Declaration (Pls' Br. 8) did not involve Monfils' timesheet but an annual questionnaire, and there is no evidence that Monfils changed her answer to the questionnaire "fearing reprisal and under pressure" as Plaintiffs claim. The individual who purportedly asked Plaintiff to change her answer was not Monfils' Branch Manager, as Plaintiffs allege, and did not supervise her.  Monfils Dep. 24; Kout. Decl.¶30.

[13]  Goldman regularly arrived late, in some instances up to three and four hours late, and left early and was eventually terminated for her continual tardiness.  Goldman Dep. at 77, 102-03, 141, Ex. 8.  Goldman had 24 instances of coming in late or leaving early after her first written warning for tardiness – half of which involved her arriving more than an hour late or leaving more than an hour early.  Id.  Although she claimed that her manager asked her to revise her timesheets to show less overtime, she conceded that she did not know whether the conversation at issue may have related to his request that she accurately record times when she arrived late.  Id. at 112.

18

any – ever having to get any kind of approval."); Cetina Dep. 64 (manager would approve overtime

for "valid" reason but Cetina never requested overtime or asked what would be a valid reason);

Amador Dep. 177-78 (manager had discretion to approve overtime but criteria was "arbitrary").  In

fact, managers have discretion to approve overtime for any reason they see as valid, Kout. Decl. ¶29,

and other CSAs consistently received overtime to finish up their regular work and without ever

having to request prior approval.  Reyes Decl. ¶ 3; Gilchrist Decl. ¶ 3.

      <u>Whether The Work Was Compensable</u>:  Cetina was a student while he worked at MS&Co.

and took breaks from work to communicate with other students and to post blogs as part of his

course work, which Defendants will contend is not compensable.  Cetina Dep. 34-36, 41-42.  Other

Plaintiffs testified that sometimes they worked only a few minutes of uncompensated overtime in a

particular week, which may not be compensable as *de minimis*.  Amador Dep. 247.  Other work may

not be compensable as preliminary or postliminary.  <u>See</u> <u>Zivali</u>, 784 F. Supp. 2d at 546 (decertifying

collective action in part because the *de minimis* doctrine defense would require an individualized

inquiry that would "vary widely according to the particular situation of each individual plaintiff").

      <u>Whether A Manager Knew Or Should Have Known That A CSA Worked Unpaid Overtime</u>.

Adjudicating Plaintiffs' claim that managers turned a "blind-eye" would involve a fact-intensive

inquiry into what each manager knew or should have known.  Some managers had a clear sight from

their desk to the CSA (Amador Dep. 64), others could not see the CSA from their desk (Sunkett

Dep. 41-42; Roberts Dep. 40-42), and others were in a different location altogether (Monfils Dep.

22, 26).  <u>See</u> <u>Joza</u>, 2010 WL 3619551, at *10 (rejecting argument that employer was on notice of

unpaid overtime because "managers periodically passed by her cubicle and should have noticed that

she was there during the usual lunch period and outside of her assigned shift hours.").  Some

managers kept different hours than the CSA and would not know that they worked uncompensated

overtime.  Cetina Dep. 71 ("it was a little bit harder for him to see me working overtime because the

19

hours he kept were a little erratic"). Some Plaintiffs had no reason to believe that their managers

knew they worked uncompensated overtime. Sunkett Dep. 60; McGrath Dep. 127; Cetina 172-75.

    <u>Plaintiffs Are Not Similarly Situated To Each Other</u>.  The evidence Plaintiffs cite in support

of conditional certification consists solely of their own testimony, and a few anecdotal documents,

relating only to themselves and no other Plaintiff or Opt-in.  Were the current Plaintiffs and Opt-ins

to proceed to trial, each would have to testify in support of his or her own claim, and Defendants

would have to be permitted to introduce contrary evidence as to each claim.[14]

    For example, a CSA who claims he or she did not record his or her time at all (Sunkett Dep.

52-54, 73; Pierce Dep. 90-91), is not similarly situated to those who recorded their start and stop

work times time to the minute each day and submitted each time record with a certification of

accuracy (all branch CSAs at MSSB from January 2010 to the present).  A CSA whose manager

allegedly told the CSA to alter his time sheets to make them inaccurate is not similarly situated to a

CSA whose manager gave the opposite instruction – to record overtime (Amador Dep. 71).  A CSA

who allegedly complained to HR (Dunaway Decl. ¶ 11), is not similarly to CSAs who did not (all

Plaintiffs/Opt-ins).[15]  A CSA who was habitually late to work and terminated for excessive tardiness

(Goldman Dep. 77, 102-03, 141), is not similarly situated to other CSAs who claim they started

---

[14]  It is now the law of the land that "Trial by Formula" – litigating a sample set of individual claims and then extrapolating liability as to the larger group on a percentage basis – is improper. <u>Wal-Mart</u>, 131 S. Ct. at 2561 ("We disapprove that novel project.").

[15]  Declarant Dunaway claims that she communicated with an unidentified individual in HR at an unspecified time about her manager changing her time, and alleges only that HR told her that her manager had the ability to change time, not that they could change it so it was inaccurate. Dunaway Decl. ¶11; <u>cf.</u> Kout. Decl. ¶19.  Although her allegations are too vague to respond to, even if true, none of the other Plaintiffs made a similar complaint.  <u>See</u> <u>Hinojos</u>, 2006 WL 3712944, at *3 (denying conditional certification in part because "defendant would be entitled to show that any changes to time records were made for appropriate reasons such as legitimate errors made by employees or supervisors").

work early (Amador Dep. 59).   A CSA who disregarded her manager's directive to "go home"

(Goldman Dep. 165-66), is not similarly situated to CSAs who were not given that directive.

Although Plaintiffs' allegations need not be identical, they must be sufficiently similar with

respect to the facts upon which their claims will be determined that those claims can be adjudicated

by common evidence consistent with due process.   The factual differences among the Plaintiffs and

Opt-Ins would be material to one or more elements of the claim, and whatever a trier of fact might

conclude as to one would establish absolutely nothing about any other Plaintiff/Opt-in.

There is also zero competent evidence that, even if the individual managers did what

Plaintiffs claim, it was "pursuant to a corporate policy" of requiring CSAs to work off the clock.

Pls' Br. 20.[16]   Significantly, some Plaintiffs testified that under different managers, different

branches, or different time periods, they recorded and were paid for all time worked.   See McGrath

Dep. 102-03 (recorded and paid for all overtime for about half of her employment); Roberts Dep.

156-57; Goldman Dep. 106-07.

Plaintiffs' motion should be denied.   See, e.g., Brickey, 272 F.R.D. at 345, 347-48 (denying

conditional certification despite off-the-clock claims by six plaintiffs at different locations, because

"[a]lthough plaintiffs have offered some evidence that certain Dolgencorp managers flouted

---

[16]   Plaintiffs support their motion with three declarants who were not previously identified whom
Defendants have not had any opportunity to depose. These declarants claim that that "like me" all
other CSAs regularly worked overtime and this was a "routine and necessary part" of the CSA
position. Dunaway Decl. ¶¶3-4, 12; Fulk Decl.¶¶ 3-4, 12; Forrest Decl. ¶¶2-3. The declarants
provide no foundation for having any personal knowledge of what any other CSA does, much less
"all" CSAs nationwide. See Hollander v. Am. Cyanamid Co., 172 F.3d 192, 198 (2d Cir. 1999) ("A
court may. . . strike portions of an affidavit that are not based upon the affiant's personal knowledge,
contain inadmissible hearsay or make generalized and conclusory statements."), abrogated on other
grounds by, Reeves v. Sanderson Plumb. Prods., Inc., 530 U.S. 133 (2000); Richards v. Computer
Scis. Corp., 2004 WL 2211691, at *2 (D. Conn. Sept. 28, 2004) (striking statements claiming that
other employees "face the same conditions" because plaintiff offered "no evidence of personal
knowledge to support [this] statement"). Defendants further object to the deposition testimony
cited on pages 11-12 of Plaintiffs' Brief and the following portions of the declarations on the
grounds that they contain inadmissible hearsay: Dunaway Decl. ¶ 16, Forrest ¶ 14. Richards,
2004 WL 2211691, at *1 (striking statements that others said they wanted to join the suit).

Dolgencorp's [written] policies, plaintiffs have not shown that such activity was widespread or common practice, or that the managers did so because they were instructed, compelled, forced, or encouraged to do so"); Richardson, 2012 WL 334038, at *1 n.1 (denying conditional certification despite allegations of off-the-clock work by nine plaintiffs and opt-ins); Hinojos, 2006 WL 3712944, at *1-3 (the mere fact that six plaintiffs and five declarants alleged they worked off-the-clock did not show improper common policy justifying conditional certification).

### D.   The Cases Cited By Plaintiffs Are Readily Distinguishable.

In Winfield v. Citibank, 843 F. Supp. 2d 397, 404 (S.D.N.Y. 2012), the Court authorized notice based upon what it characterized as an "overarching policy" of "strictly limiting" overtime together with "sales quotas [that] were set by uniform nationwide standards" and "enforced by a nationwide step-by-step disciplinary process with penalties including probation and termination." Plaintiffs have not established any "overarching policy" on overtime and there is no requirement here that CSAs meet any productivity goals or face required termination.  In addition, unlike this case, in Winfield the practice of working off-the-clock allegedly was tied to directives from higher level Regional and Area Managers. Id. at 407-08.  Nor did Winfield involve two separate entities with different timekeeping systems and overtime policies, as exist here.[17]

In Hernandez v. Merrill Lynch & Co., 2012 WL 1193836, at *1 (S.D.N.Y. Apr. 6, 2012), the class was much smaller in scope – involving only three locations and a total of only approximately 300 employees.  Moreover, just as in Winfield, the Hernandez court concluded that Merrill Lynch had a policy setting uniform performance goals that were impossible to meet without overtime (id. at *2, *4).  Finally, the Hernandez court applied the most lenient standard for conditional certification

---

[17]  Plaintiffs' claim that "all CSAs" were paid under a "uniform, corporate compensation plan" is both inaccurate and irrelevant. Pls' Br. 21; see Kout. Decl. ¶9.  They do not challenge any aspect of the alleged "compensation plan" in this case, nor do they claim that there was a compensation plan with performance targets that caused overtime, like the allegation in Winfield.

because plaintiffs had less than the four months of discovery allowed in Eng-Hatcher, did not receive hundreds of documents and had no opportunity to take depositions. Id. at *5 n.5. Here, Plaintiffs have had a seven-month period of discovery, including email discovery and the opportunity to take depositions. Linthorst Decl. ¶¶2-4.

The Levy and Gilbert cases are even less similar to this case than Winfield and Hernandez. Levy v. Verizon Info. Servs., Inc., 2007 WL 1747104, at *1, *5 (E.D.N.Y. Jun. 11, 2007) (certifying collective action for Telephone Sales Representatives ("TSRs") in three states where Verizon had "no system by which TSRs can record the hours they worked" and 16 of the TSR declarations submitted by *defendants* actually stated that the TSRs were not paid for unapproved overtime that they worked); Gilbert v. Citigroup, Inc., 2009 WL 424320, at *3 (N.D Cal. Feb. 18, 2009) (stating that certification was appropriate because BBOs ***were all exempt*** and paid the same way nationwide prior to reclassification and "neither side contests that BBOs throughout the country were transferred to new positions around the middle of 2007.").

### E.   If This Court Were to Permit Any Further Notice, Which It Should Not, It Should be Limited Only to the Plaintiffs' Branches.

Even if, contrary to the conclusive evidence discussed above, the Court concludes that Plaintiffs have shown some uniformity of experiences amongst themselves, they have not shown that such work was pursuant to a nationwide unlawful policy or practice. Courts that have permitted any conditional certification and notice in such circumstances have generally limited notice to only those locations where the plaintiff submitted competent evidence that a violation may have occurred. See, e.g., Rudd v. T.L. Cannon Corp., 2011 WL 831446, at *9-10 (N.D.N.Y. Jan. 4, 2011) (conditionally certified off-the-clock collective action only at location where the affiants worked); Hens v. ClientLogic Operating Corp., 2006 WL 2795620, at *4-5 (W.D.N.Y. Sept. 26, 2006) (where

Plaintiffs filed over 60 declarations to support their allegations of nationwide policy of off-the-clock work, notice limited to facilities in 4 cities where plaintiffs or declarants worked).[18]

Moreover, if notice is granted, such notice should not be sent to CSAs who worked for Defendants in California.  An earlier-filed action – <u>Martinez v. Morgan Stanley & Co.</u>, No. 37-2009-00103267 (Ca. Super. Ct.) – is proceeding in California state court.  Although the case predominantly involves California claims, the case also includes overtime claims under both state law and the FLSA on behalf of all CSAs in California.  Plaintiffs in this case had informed Defendants that they were aware of <u>Martinez</u> and intended to exclude California from their notice motion, but inexplicably did not do so.  Linthorst Decl. ¶¶6-7.  The parties in <u>Martinez</u> have reached a settlement in principle and will be requesting that settlement notice be sent to California CSAs by that Court to resolve all claims in that case.  Linthorst Decl. ¶8.  Courts have held that where there is overlap between class claims brought in two different actions, it is inappropriate and inefficient to send duplicative notice to putative class members.  <u>See, e.g.</u>, <u>Jones v. Qwest Commc'ns Int'l, Inc.</u>, 2007 WL 4179385, at *4-5 (D. Minn. Nov. 20, 2007) ("[I]ssuing new Court-approved opt-in notices for a potential class that is already subsumed within the [nationwide] class will cause undue confusion and duplication [which] would be contrary to the very purpose of Court-facilitated notice . . . ."); <u>Campbell v. Pricewaterhouse Coopers, LLP</u>, 2008 WL 2345035, at *1-2 (E.D. Cal. June 5, 2008) ("it is possible that the only appropriate nationwide [FLSA] collective action that could be certified is one that carves out California, in light of the class already certified here.").

---

[18]  <u>See also</u> <u>Burkhart-Deal v. CitiFinancial, Inc.</u>, 2010 WL 457127, at *5 (W.D. Pa. Feb. 4, 2010) (limiting certification only to branches where Plaintiff and individuals who submitted declarations in support of certification worked); <u>Camper v. Home Quality Mgmt. Inc.</u>, 200 F.R.D. 516, 520-21 (D. Md. 2000) (authorizing notice for employees only at one nursing home facility, and rejecting request for nationwide notice, of off-the-clock claims because plaintiffs could not show actual or constructive knowledge by managers that employees were working off-the-clock).

**F.**     **The Notice Requested By Plaintiff Is Inappropriate.**

If the Court were to order notice, which, for the reasons set forth above, Defendants respectfully maintain would not be appropriate, the Court should deny Plaintiffs' request to obtain CSA phone numbers and email addresses and their request to post notice in all MSSB branches. There is no reason why a clear written notice sent to the individual's home is not a sufficient means of notifying the individual of this case and the opportunity to join. CSAs should not be subjected to telephone calls or bombarded with notices. See, e.g., Hintergerger v. Catholic Health Sys., 2009 WL 3464134, at *13 (W.D.N.Y. Oct. 21, 2009) (rejecting request for email addresses and to post notice in defendant's locations); Gordon v. Kaleida Health, 2009 WL 3334784, at *11 (W.D.N.Y. Oct. 14, 2009) (same); Alli v. Boston Mkt. Co., 2011 WL 4006691, at *6 (D. Conn. Sep. 8, 2011) (denying request for phone numbers because no need was shown); Colozzi v. St. Joseph's Hosp. Health Ctr., 595 F. Supp. 2d 200, 210 (N.D.N.Y. 2009) (denying email addresses and phone numbers); Fengler v. Crouse Health Found., Inc., 595 F. Supp. 2d 189, 198 (N.D.N.Y. 2009) (same).

**IV.     CONCLUSION**

No legitimate purpose would be served by sending notice to almost 10,000 CSAs inviting them to file claims that would not otherwise be filed when it is clear now that there is no common basis on which to adjudicate the claims of all CSAs. Such a result would be antithetical to a statute that has been amended to prevent "excessive litigation" and to promote judicial efficiency, and it would undermine the strong policies and procedures that employers like Defendants have put in place to prevent any uncompensated work. To be sure, those policies do not immunize employers, but they certainly belie any claim of a classwide policy or practice to do the opposite of what is mandated by the policy, and courts should not lightly disregard these good faith efforts to comply with the law. For all the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' Motion for Conditional Collective Certification and Court Authorized Notice.

Dated:   December 7, 2012                    Respectfully submitted,

                                            MORGAN, LEWIS & BOCKIUS LLP
                                             s/Thomas A. Linthorst
                                            Thomas A. Linthorst (TL 3345)
                                            101 Park Avenue
                                            New York, New York 10178
                                            (212) 309-6000 (Telephone)
                                            (212) 309-6001 (Fax)
                                            tlinthorst@morganlewis.com
                                            Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served via ECF on this 7th day of

December, 2012 as listed below:

**KLAFTER, OLSEN & LESSER, LLP**
Seth R. Lesser
Fran L. Rudich
Two International Drive, Suite 350
Rye Brook, NY  10573
Tel:  914-934-9200; (Fax) 914-934-9220

and

**SHAVITZ LAW GROUP, P.A.**
Gregg I Shavitz (admitted *pro hac vice*)
Susan H. Stern (admitted *pro hac vice*)
1515 South Federal Highway, Suite 404
Boca Raton, FL 33432
Tel: (561) 447-8888; Fax: (561) 447-8831

Attorneys for Plaintiffs

/s/ Thomas A. Linthorst